**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE GREAT LAKES DREDGE & DOCK CORPORATION SECURITIES LITIGATION | CASE NO. 1:13-CV-02115 <br><br> CLASS ACTION <br><br> <u>JURY TRIAL DEMANDED</u> |

**<u>AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................1

II. NATURE OF THE ACTION ................................................................................7

III. PARTIES ...............................................................................................................8

    A. PLAINTIFF ....................................................................................................8

    B. DEFENDANTS ................................................................................................8

        1. *The Company* ....................................................................................8

        2. *The Individual Defendants* ..............................................................9

IV. BACKGROUND AND NATURE OF THE FRAUD AT GLDD....................11

    A. BACKGROUND OF GLDD ...........................................................................11

    B. GLDD'S DEMOLITION SEGMENT AND THE COMPANY'S TREATMENT OF COST OVERRUNS AND CHANGE ORDERS..................................................12

    C. DEFENDANTS DEFRAUDED THE COMPANY'S SHAREHOLDERS BY BOOKING CHANGE ORDERS AS REVENUE TO BOLSTER GLDD'S FINANCIALS .....................15

        1. *GLDD's New York Area Demolition Operations Financially Were "Unsalvageable" From The Very Beginning* ...........................................15

        2. *The Company Surreptitiously Masked NASDI's Cost Overruns And Artificially Inflated Its Financials*.................................................21

        3. *Defendants Were Well Aware Of And Approved Of GLDD's Fraudulent Accounting Manipulations* ......................................................25

V. THE TRUTH EMERGES...................................................................................28

VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS .....................39

    A. FALSE STATEMENTS REGARDING FINANCIAL CONDITION AND OPERATING RESULTS .....................................................................................................39

        1. *Second Quarter 2012 False And Misleading Statements* ...........................39

        2. *Third Quarter 2012 False And Misleading Statements* .............................46

        3. *Fourth Quarter 2012 and First Quarter 2013 False And Misleading Statements* .................................................................52

          4.     *False And Misleading Certifications and Disclosure Representations* ........................................................55

    B.     FALSE STATEMENTS REGARDING GLDD'S ACCOUNTING PRACTICES ...................59

    C.     FALSE STATEMENTS REGARDING GOODWILL ........................................62

    D.     FALSE STATEMENTS REGARDING INTERNAL CONTROLS........................................64

VII.    RELEVANT GAAP AND ACCOUNTING PROVISIONS ...............................................68

    A.     OVERVIEW OF GAAP........................................................................68

    B.     DEFENDANTS' IMPROPER REVENUE RECOGNITION ..................................69

    C.     DEFENDANTS' FAILURE TO PROPERLY ACCOUNT FOR COST OVERRUNS ...............73

    D.     DEFENDANTS' IMPROPER ACCOUNTING OF ACCOUNTS RECEIVABLE ...................74

    E.     DEFENDANTS' IMPROPER ACCOUNTING FOR GOODWILL........................................77

    F.     DEFENDANTS' ACCOUNTING IMPROPRIETIES WERE MATERIAL TO GLDD'S FINANCIAL STATEMENTS AS EVIDENCED BY THE RESTATEMENT ITSELF .............81

    G.     DEFENDANTS FAILED TO DISCLOSE KNOWN TRENDS OR UNCERTAINTIES IN VIOLATION OF SEC REGULATIONS ........................................................83

    H.     DEFENDANTS KNEW, OR WERE RECKLESS IN NOT KNOWING, THAT GLDD'S INTERNAL ACCOUNTING CONTROLS WERE INADEQUATE .......................86

VIII.    LOSS CAUSATION........................................................................88

IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ........................................................................90

X.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ....................................91

XII.    JURISDICTION AND VENUE ........................................................................93

XIII.    CLAIMS AGAINST DEFENDANTS UNDER THE EXCHANGE ACT ......................94

    FIRST CLAIM FOR RELIEF ........................................................................94

    SECOND CLAIM FOR RELIEF ........................................................................97

XIV.    PRAYER FOR RELIEF ........................................................................100

XV.    JURY DEMAND ........................................................................100

## I.     INTRODUCTION

1.     Defendants in this securities class action engaged in a simple and straightforward fraud.  In the years leading up to the Class Period, Great Lakes Dredge & Dock Corporation ("GLDD" or the "Company") wanted to bolster the public perception and financial metrics of the Company's demolition segment to demonstrate that it was an integral part of GLDD's overall business plan and that it would contribute an increasingly large percentage of the Company's overall financial results moving forward.  To that end, in 2010, GLDD announced plans to expand its demolition footprint from the Company's historically New England-centric geographical focus into the uniquely competitive New York market.  Defendants publicly touted this New York expansion as indicative of the Company's focus on demolition as a central and complementary piece of its overall operations and growth strategy.

2.     In a short-sighted attempt to gain a foothold in New York, however, Defendants significantly underbid on demolition projects, including, in particular, the Whitestone Bridge and the St. George Ferry Terminal projects.  Defendants' misguided decisions led to massive cost overruns in these New York projects nearly from their inception and an awareness among all of the Company's officials that the projects were destined for massive financial failure.  Indeed, two former employees who were directly responsible for leading and managing the Company's New York demolition projects both attest that the Whitestone and St. George Ferry projects were bleeding money almost "*from day one*," that these cost overruns were directly due to GLDD's wildly inadequate bidding in order to obtain the contracts on the projects, and that they directly informed their superiors at the Company's demolition headquarters in Boston and GLDD's main offices in Illinois about these cost overruns.

1

3.  For instance, a former Vice President of Operations for the Company's New York demolition segment recalled how GLDD's demolition executives had not only severely underbid the projects, but had completely disregarded the unique and costly nature of New York labor requirements, resulting in "*tons of change orders*."  GLDD personnel, who also reviewed New York projects, "*knew long in advance if a job*" was going to be a "*bust*" with personnel specifically acknowledging that projects were "*unsalvageable*."  Another former employee of the Company's demolition division who actually provided an estimate for these projects to GLDD officials that was supposed to be used as the basis for the Company's bid, also confirmed that this estimate took into account the full extent of costs and labor expenses inherent in the New York market, and that the Company's actual bid, which was negotiated by GLDD's demolition division executives, largely did not reflect the entire parameters of the estimate.  For instance, this former Business Development Estimator stated that the ultimate bids were a "*different story*" from the submitted estimates—estimates which, according to this witness, took into account the costs of doing demolition business in New York.

4.  For some time, Defendants successfully delayed the accurate reporting of these losses by manipulating costs and expenses between demolition projects so that more profitable projects would, on paper, absorb the cost overruns plaguing the troubled New York projects. One former employee recalled that a myriad of the Company's demolition projects "*definitely had money moved around*" on them, and that these accounting manipulations were openly discussed at executive meetings for the Company's demolition segment—"*everyone knew*."  As costs spiraled out of control on these projects, however, Defendants submitted change orders for excess costs—in effect, requesting payment from the client for amounts above and beyond the specifications of the contract governing the specific project.

5. As former employees of GLDD and its demolition division attest, the Company was well-aware that it was highly unrealistic that GLDD would receive payment for these cost overruns through unapproved change orders. For instance, one former Vice President of Operations for the Company's demolition operations recalled that, while a plethora of change orders may have been filed, "if you read the contracts" there was considerable doubt that the Company would be able to get paid for these change orders and that GLDD often had to fight legally to get paid. This former employee went so far as to say "good luck" so far as the Company's demolition division actually getting paid. Defendants' accounting improprieties and operational deficiencies led a former GLDD accountant to state that she *believed that GLDD's shareholders were misled by the Company*.

6. Despite this knowledge, during the Class Period, Defendants booked the proposed contract increases listed on change orders as revenue when, in actuality, those change orders remained pending without client approval. Indeed, client approval for the cost increases included therein was not finalized and, in many cases, was not forthcoming. In so doing, Defendants materially increased GLDD's financial results during the Class Period, thus enhancing the Company's optics from a financial point of view as well as the desirability of its securities. In turn, Defendants' fraud had the effect of artificially inflating GLDD's stock price, reaching a Class Period-high of $10.03 on February 19, 2013.

7. Less than a month later, Defendants' scheme finally came crashing down on March 14, 2013, when the Company was forced to disclose that it had improperly recognized revenues during the Class Period as a result of booking unapproved change orders as revenues. As a result, GLDD was required to restate results from its second and third quarters of 2012, delay its annual report and default on a loan covenant. In addition, GLDD announced the

3

immediate departure of Defendant Biemeck, a longtime executive who had been both President and Chief Financial Officer of the Company. The Company further acknowledged a plethora of stunning disclosures resulting from Defendants' fraud, including $2 million in cost overruns and lower-than-expected profits on several projects. In sum, cash flow was $24 million short of what analysts were led to expect, and predictions of a modest profit turned into a $3.3 million loss.

8.     In announcing the restatement, Defendants downplayed its significance, stressing that the prematurely recognized revenues would likely be obtained in the near future and that the effects of the restatement were marginal. Defendants' minimization of their misdeeds is belied, however, by the material nature of GLDD's intentionally-inflated financial results and the outsized effect it had on the appearance of the Company's business as a whole.

9.     Specifically, as a result of the Company's artificially inflated financial results garnered through Defendants' illicit and improper revenue recognition, GLDD's financial results were overstated during the Class Period in the following material amounts: (i) revenues for the demolition segment were overstated by $3.9 million and $4.3 million for the 2nd and 3rd quarters of 2012; (ii) the Company's accounts receivables were overstated at June 30, 2012 and September 30, 2012, by approximately $1.7 million and $6.9 million; (iii) GLDD's contract revenues were overstated by $3.4 million, or 2.1%, for the quarter ended June 30, 2012 and by $4.3 million, or 2.6%, for the quarter ended September 30, 2012; and (iv) most importantly, the restatement adversely impacted net income, which was reduced by approximately $3.2 million, or 73%, for the quarter ended June 30, 2012. As the charts below demonstrate, the Company's operating and net income for the third quarter of 2012, as well as its earnings per share during the Class Period, were materially affected by the restated financial results, in some cases turning a gain to a loss:

*Operating And Net Income*



*Earnings Per Share*



10.     Immediately after GLDD's announcements, the Company's stock price plummeted from a close of $8.97 per share on March 14, 2013 to $7.35 per share on March 15, 2013, a decline of 18% on unusually heavy trading volume.  Defendants tried their best to manage the impact of the restatement, resorting to disseminating further false and misleading statements and omissions regarding the magnitude of the restatement.  The full truth finally came to light after the close of the markets on August 7, 2013, when the Company reported further earnings disappointment, including a belated $21.5 million goodwill impairment charge from its demolition segment, additional unrecoverable revenue from unapproved change orders, and the fact that the Company resorted to filing a lawsuit in order to attempt to recoup some of the change order revenue, all of which stand in stark contrast to their downplays months earlier.  On this news, GLDD's stock price declined an additional 16% in intra-day trading.

11.     The glaring truth is that, faced with the pressures of masking the financial failures of a business segment that GLDD had been touting as a central element of its growth strategy, Defendants hid the fact that this troubled division was facing millions of dollars in cost overruns due to the overriding desire to capture a significant part of the previously untapped New York market.  To that end, Defendants caused the Company to improperly book revenue from unapproved change orders that they were well-aware were unlikely to be paid in the near term, if ever.  Although they were obligated to "ensure that material information relating" to GLDD and its subsidiaries was made known to Defendants and disclosed to shareholders, and despite the fact that Defendants certified that they met their responsibilities in this regard, Defendants falsified the Company's financials and issued materially false and misleading statements concerning GLDD's accounting practices and the adequacy of the Company's internal controls. In so doing, Defendants committed a fraud upon Lead Plaintiff and the Class.

## II.    NATURE OF THE ACTION[1]

12.    This is a federal securities class action against GLDD and certain of its officers and/or directors for violations of the federal securities laws.  Lead Plaintiff brings this action on behalf of all persons or entities that purchased GLDD securities between August 7, 2012 and August 7, 2013, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  The Exchange Act claims allege that Defendants engaged in a fraudulent scheme to artificially inflate the Company's stock price.

13.    Lead Plaintiff alleges that, throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and accounting practices, including the Company's accounting for change orders as improper revenue, as well as the integrity of its internal controls.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose, among other things: (i) that the Company was booking change orders as revenue when, in actuality, those orders were pending and client approval for the cost increases included therein was not finalized and, in many cases, was not forthcoming; (ii) that such revenue recognition practices within GLDD's demolition segment were improper and misleading; (iii) that the Company's financial statements during the Class

---

[1] Lead Plaintiff United Union of Roofers, Waterproofers & Allied Workers Local Union No. 8 ("Plaintiff") alleges upon personal knowledge as to allegations specifically pertaining to Plaintiff and, as to all other matters, upon the investigation of its counsel.  Many of the facts related to Plaintiff's allegations are known only by the Defendants, or are exclusively within their custody or control.  Lead Counsel's investigation included, among other things, without limitation: (a) review and analysis of public filings made by GLDD and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on the Company's website concerning the Company's public statements; (d) review of other publicly available information concerning GLDD and the Individual Defendants (as defined below); and (e) interviews of confidential witnesses, each of whom was a former employee of GLDD or its subsidiaries.  Lead Plaintiff believes that substantial additional evidentiary support for its allegations will be developed after a reasonable opportunity for discovery.

Period did not provide a fair presentation of the Company's finances and operations, including GLDD's overstated revenue; (iii) that, as a result, the Company's financial results were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); (iv) that the Company lacked adequate internal and financial controls; and (v) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

14.     Defendants' wrongful acts and false and misleading statements and omissions have caused a precipitous decline in the market value of the Company's stock.  Lead Plaintiff and other Class members have suffered significant losses and damages.

## III.   PARTIES

### A.   PLAINTIFF

15.     Lead Plaintiff purchased the publicly traded GLDD securities at artificially inflated prices during the Class Period and has been damaged thereby.  Evidence of Plaintiffs' transaction in the Company's securities during the Class Period was previously filed with the Court and are incorporated herein by reference.  *See* Dkt. #15-2 (Certification and Authorization of Lead Plaintiff).

### B.   DEFENDANTS

#### 1.     *The Company*

16.     Defendant GLDD is a holding company that conducts substantially all of its domestic dredging operations through Great Lakes Dredge & Dock Company, LLC and its demolition operations through NASDI, LLC and Yankee Environmental Services, LLC. GLDD's principal executive offices are located at 2122 York Road, Oak Brook, IL 60523. GLDD engages in the business of marine construction, dredging, and commercial and industrial demolition.

## 2.    *The Individual Defendants*

17.    Defendant Jonathan W. Berger has served as Chief Executive Officer at GLDD since September 2010 and as a Director of the Board since December 2006.  He also serves as Chair of the Audit Committee.  Defendant Berger signed GLDD's false and misleading Form 10-K filed with the SEC on March 29, 2013.[2]  Defendant Berger also signed the certifications filed as exhibits to the Company's Forms 10-Q filed with the SEC on August 7, 2012,[3] November 7, 2012[4] and May 8, 2013,[5] and the Company's Form 10-K filed with the SEC March 29, 2013. Berger falsely certified that the Company's Class Period false and misleading filings fairly presented GLDD financial conditions and results of operations, and he falsely certified that the Company's internal controls were effective and compliant with Rule 13a-15(f) or 15d-15(f) promulgated under the Exchange Act.  Berger also made statements in and was directly responsible for other false and misleading statements disseminated in GLDD press releases filed with the SEC on Forms 8-K on August 7, 2012, November 6, 2012, March 14, 2013 and May 7, 2013.  Berger also made false and misleading statements during the earnings calls on August 7, 2012, March 15, 2013 and May 7, 2013, and the investor presentation conference on September 20, 2012.

18.    Defendant Bruce Biemeck served as President and Chief Operating Officer at GLDD since August 2012 and resigned from his positions effective March 13, 2013.  From September 2010 to August 2012, Biemeck served as the Company's Chief Financial Officer.

---

[2] The Company's annual filing on Form 10-K filed with the SEC on March 29, 2013 for the period ending December 31, 2012 ("2012 Form 10-K").
[3] The Company's quarterly filing on Form 10-Q filed with the SEC on August 7, 2012 for the period ending June 30, 2012 ("2012 Quarter 2 Form 10-Q").
[4] The Company's quarterly filing on Form 10-Q filed with the SEC on November 7, 2012 for the period ending September 30, 2012 ("2012 Quarter 3 Form 10-Q").
[5] The Company's quarterly filing on Form 10-Q filed with the SEC on May 8, 2013 for the period ending March 31, 2013 ("2013 Quarter 1 Form 10-Q").

Defendant Biemeck signed GLDD's false and misleading Form 10-Q filed with the SEC on August 7, 2012. In addition, Biemeck falsely certified that the false and misleading filing fairly presented GLDD's financial condition and its results of operations, and he falsely certified that the Company's internal controls were effective and compliant with Rule 13a-15(f) or 15d-15(f) promulgated under the Exchange Act. Biemeck made false and misleading statements in and was directly responsible for other statements made in GLDD's press releases filed with the SEC on Forms 8-K on August 7, 2012 and November 6, 2012. Biemeck also made false and misleading statements during an earnings call on November 6, 2012.

19.     Defendant William S. Steckel has served as Senior Vice President and Chief Financial Officer of GLDD since August 2012. Defendant Steckel signed GLDD's false and misleading Forms 10-Q filed with the SEC on November 7, 2012 and May 8, 2013 and the false and misleading Form 10-K filed with the SEC on March 29, 2013. In addition, Steckel falsely certified that the Company's false and misleading filings fairly presented GLDD's financial condition and results of operations, and he falsely certified that the Company's internal controls were effective and compliant with Rule 13a-15(f) or 15d-15(f) promulgated under the Exchange Act. Steckel made false and misleading statements in and was directly responsible for other false and misleading statements made in GLDD's press releases filed with the SEC on Forms 8-K on November 6, 2012, March 14, 2013 and May 7, 2013. Steckel also made false and misleading statements during the investor presentation conference on October 11, 2012 and the earnings calls on March 15, 2013 and May 7, 2013.

20.     Defendants Berger, Biemeck and Steckel regularly made false and misleading statements: (i) attributing Company revenue growth to revenue increases in the Company's demolition segment; (ii) asserting that the demolition segment had turned around, business was

growing and it was experiencing higher revenues; (iii) assuring that unprofitable demolition projects had closed out and wrapped up and therefore the demolition segment was improving and becoming more profitable; and (iv) alleging that the Company engaged in sound project estimating and execution in its demolition segment that attributed to positive financial results. Defendants Berger, Biemeck and Steckel are collectively referred to herein as the "Individual Defendants."

21.     GLDD and the Individual Defendants are collectively referred to herein as "Defendants."

## IV.     BACKGROUND AND NATURE OF THE FRAUD AT GLDD

### A.     BACKGROUND OF GLDD

22.     Dredging generally involves the enhancement or preservation of navigability of waterways or the protection of shorelines through the removal or replenishment of soil, sand or rock.  GLDD is the largest provider of dredging services in the United States and the only U.S. dredging service provider with significant international operations.  The Company owns the largest fleet in the U.S. industry, comprised of over 200 specialized vessels.

23.     GLDD is also one of the largest U.S. providers of commercial and industrial demolition services, most of which are primarily concentrated in the Northeast.  In the first nine months of 2011, demolition revenues accounted for 15% of total revenues, above the prior three year average of 12%.  The Company owns a 50% interest in a marine sand mining operation in New Jersey that supplies sand and aggregate for road and building construction and a 50% interest in an environmental service operation with the ability to remediate contaminated soil and dredged sediment treatment.

### B. GLDD'S DEMOLITION SEGMENT AND THE COMPANY'S TREATMENT OF COST OVERRUNS AND CHANGE ORDERS

24. GLDD owns NASDI, LLC ("NASDI") a demolition services provider located in the Boston, Massachusetts area. NASDI's principal services consist of interior and exterior demolition of commercial and industrial buildings, salvage and recycling of related materials, and removal of hazardous substances and materials. The majority of NASDI's work has historically been performed in the New England area; however, in recent years, in an effort to materially increase the Company's demolition business segment and place this segment as a centerpiece of GLDD's growth strategy, NASDI has expanded into the New York area and other markets including marine and bridge demolition.

25. The Company's demolition expansion into New York was a fact boasted about to investors. In GLDD's Form 10-K for 2010, the Company stated that "[t]he majority of NASDI's work is performed in the New England area, although NASDI recently has expanded into the New York area and marine demolition markets, specifically, bridge demolition." The demolition segment was based in the Boston area out of NASDI's Waltham, Massachusetts offices, but "as the demolition segment [] expanded into the New York market, the Company leas[ed] 1,500 square feet of office space in New York." Further stressing how the Company was expanding its footprint into new territory, GLDD highlighted how the "demolition business continue[d] to gain momentum." This expansion strategy led to demolition revenues as a percentage of total revenues increasing on a year-over-year basis, up until the Company was forced to restate financial results in 2012:



26.     NASDI generates revenues when it is awarded a contract for demolition services and performs the project.  According to the Company's Form 10-K for 2011, which was filed with the SEC on March 9, 2012, GLDD benefits from "key relationships with certain general and construction contractors in the Massachusetts market" as well as the Company's "reputation in the Massachusetts market developed over years of successfully performing on projects."  GLDD disclosed that "[b]oth of these aspects of the business were developed and are maintained primarily by the officers of NASDI."

27.     NASDI recognizes contract revenues, including salvage revenues, under the percentage-of-completion method, based on a cost-to-cost approach for demolition projects. Contract revenues are adjusted to reflect the estimated gross profit percentage.  Provisions for estimated losses on contracts in progress are made in the period in which such losses are determined.  Claims for additional compensation due to NASDI are not recognized in contract revenues until such claims are settled.  Billings on contracts are generally submitted after

verification with the customers of physical progress and may not match the timing of revenue recognition. The difference between amounts billed and recognized as revenue is reflected in the balance sheet as either contract revenues in excess of billings or billings in excess of contract revenues. Contract modifications may be negotiated when a change from the original contract specifications is encountered, necessitating a change in project scope or performance methodology and/or material disposal. Significant expenditures incurred incidental to major contracts are deferred and recognized as costs of contracts based on contract performance over the duration of the related project. These expenditures are reported as prepaid expenses.

28. In recent years, the Company's demolition division has drawn regulatory scrutiny on numerous occasions. For instance, on August 26, 2009, NASDI received a letter stating that the Attorney General for the Commonwealth of Massachusetts is investigating alleged violations of the Massachusetts Solid Waste Act. GLDD has stated that the Attorney General is investigating illegal dumping activities at a dump site NASDI contracted with to have waste materials disposed of between September 2007 and July 2008. NASDI executed a tolling agreement regarding the matter, which remains open.

29. On March 27, 2011, NASDI received a subpoena from a federal grand jury in the District of Massachusetts directing NASDI to furnish certain documents relating to certain projects performed by NASDI since January 2005. On April 6, 2011, NASDI received a subpoena from the District Attorney for Richmond County, New York in connection with a grand jury investigation. The subpoena directs NASDI to furnish certain documents relating to one project performed by NASDI and one of its subcontractors. GLDD has stated that the Company has cooperated with both subpoenas.

14

30.     During the Class Period, Defendants made false and misleading statements and failed to disclose that it had recognized revenue in a manner not consistent with its accounting policy and that certain pending change orders where client acceptance was not finalized were included as revenue.   In addition, the Company failed to disclose material weakness in its internal controls to detect or prevent misstatements in its financial statements.

## C. DEFENDANTS DEFRAUDED THE COMPANY'S SHAREHOLDERS BY BOOKING CHANGE ORDERS AS REVENUE TO BOLSTER GLDD'S FINANCIALS

### 1. *GLDD's New York Area Demolition Operations Financially Were "Unsalvageable" From The Very Beginning*

31.     Defendants engaged in a concerted effort to bolster GLDD's financials by improperly booking change orders as revenue.   Despite the fact that the Company has admitted to its improper revenue recognition practices, high-ranking former GLDD demolition segment executives confirm that, throughout the Class Period, the Company was well-aware that clients had not approved and were unlikely to pay most, if not all, of the amounts reflected in the change orders.

32.     For instance, Confidential Witness ("CW") 1 is a former Vice President of Operations for GLDD's NASDI division who was employed with the division from 2003 until approximately June 2011.  For the last couple of years of her[6] tenure, CW 1 was responsible for overseeing the Company's demolition projects in New York, including managing the worksites of the various projects, supervising Project Managers, pricing jobs, reviewing financials for the projects, managing the division office in Long Island and reporting to NASDI's offices in Boston, including then-NASDI President Chris Berardi and Vice President Tim Higgins, as well

---

[6] In furtherance of protecting the confidentiality of the witnesses quoted herein, each of the confidential witnesses are referenced in the feminine.

reporting directly to GLDD Senior Vice President of Business Development Stephen Pegg, who reported directly to Defendants Biemeck and Berger.

33.     CW 1 was in charge of the New York demolition operations from their inception, at a time when GLDD initiated expansion plans for its demolition segment from its Massachusetts-based operations into the New York market.  According to CW 1, the New York projects[7] had been "poorly bid" and the unique labor costs inherent in New York had been underestimated in the bidding process in order to obtain contracts for the Company's expansion plans.  CW 1 estimated that approximately six months after work on the St. George Ferry project had commenced she was aware that the contract and bidding would not allow enough money to complete the project without substantial cost overruns.

34.     CW 1 stated that her superiors at GLDD and its NASDI were "well aware" of the costs being incurred on the St. George Ferry project, as well as the Whitestone and other New York projects, since she was responsible for submitting project costs, including labor and expenses, every two weeks to the Company's regional and corporate headquarters.  CW 1 stated that "we were all concerned" about the costs being incurred on the St. George Ferry project.  In fact, approximately in April 2011, Stephen Pegg, the GLDD Senior Vice President of Business Development, along with other GLDD personnel, personally went to New York on various occasions to discuss the status of the New York projects with CW 1.  According to CW 1, Pegg had been charged with overseeing the Company's demolition segment while GLDD sought a new leader to permanently replace former NASDI President Berardi, who had departed at the

---

[7] Frequent NASDI contractor collaborator Conti Corporation was the contractor on both the Whitestone Bridge project and the St. George Ferry Terminal project, and NASDI was one of the key players on these projects.  *See* http://new.mta.info/press-release/bridges-tunnels/bronx-whitestone-bridge1928-million-contract-awarded-major; *see also* http://newyork.construction. com/new_york_construction_projects/2010/0601-St.GeorgeFerryTerminal.asp.

time. CW 1 stated that it was very clear during these meetings that certain of the New York projects were over-budget and that she was convinced that the shortfalls would only increase as time wore on. Simply put, CW 1 recalled that there was not enough money available in the project budgets to perform the amount of work that NASDI needed to complete the contracts.

35. Shortly after these meetings, CW 1 was let go from her position even though she was told on several recent occasions that she was doing "a great job."[8] CW 1 stated that Pegg told her that GLDD was seeking to change NASDI's management, but CW 1 felt that she was being held responsible for the poor performance of the problem New York projects, although CW 1 did not have anything to do with the bidding and contract negotiation of these projects. CW 1 identified CW 2, a former Business Development Estimator for the Company's demolition division, as being responsible for developing the Company's estimate for the New York projects. However, CW 1 explained that a project estimate was not the final word for what a given project would ultimately be bid for, and that negotiations would take place between GLDD's demolition division executives such as President Berardi and the customer or contractor on the project. CW 1 stated that she did not become directly involved with the management of a project until after it had been bid and contracted and work was ready to commence.

36. CW 2, the former Business Development Estimator, was employed at GLDD's demolition division as a salaried employee until late 2009/early 2010, at which point she came back in a consulting role for approximately six months in 2010, essentially performing the same duties that she had before. In that regard, CW 2 was responsible for estimating projects in the New York/New Jersey region, including preparing estimates for the Whitestone and St. George Ferry projects, and she has multiple decades of experience in this and similar roles. During her

---

[8] According to CW 1, CW 1 and several other NASDI personnel, including former President Berardi, were let go around the same timeframe in May and June 2011.

tenure with GLDD, CW 2 reported to multiple high-level individuals, including NASDI President Berardi.

37.     With regard to her estimates on the New York projects, CW 2 stated that her estimates took into account the unique nature of labor rates in New York, which she acknowledged were different and higher than in other states where GLDD conducted demolition activities, such as Massachusetts. CW 2 explained that the estimates for the projects that she prepared were not the same as the eventual NASDI bid for a given project since higher-level officials, including Berardi, conducted negotiations with the client or contractor, and CW 2 was not directly part of such negotiations.

38.     CW 2 stated that her estimates for the troubled New York projects, which would take approximately three to four years to complete, were entirely adequate for the work that needed to be performed, and that the levels at which the projects were ultimately bid at by the Company were a "different story" from her estimates. Although the projects had only been underway for approximately six months at the time that CW 2 left the Company, she said that she had already developed an awareness that the projects could go substantially over-budget.

39.     After CW 1 left the Company in mid-2011, CW 3 took over the lead for the Company's New York demolition operations. CW 3 is a former Vice President of Operations for the New York Region for GLDD's NASDI division who was employed with the Company for several years in various capacities until her departure in approximately March 2012. CW 3 was in charge of the New York operations for NASDI and reported directly both to the main NASDI offices in Waltham, Massachusetts and to the GLDD offices in Illinois. CW 3 noted that, for the last two years of her employment at NASDI, GLDD executives were frequently present at the NASDI offices in Massachusetts and that she would regularly report the operational and

financial statuses of her projects underway in New York to these GLDD personnel. In addition, CW 3 concurrently reported these issues to several senior executives at NASDI, including Controller Paige Lombard, Executive Vice President Mike Francis and the NASDI President.

40. CW 3 stated that, in regard to GLDD's need to restate revenues associated with two demolition projects in the New York area, the Whitestone project and the St. George Ferry project immediately came to her mind as the projects in question, along with possibly the Whitney Museum project. Although CW 3 was placed in charge of these projects months after their respective commencements, CW 3 stated that it was well known within the Company that both the Whitestone and St. George Ferry projects experienced significant cost overruns during her tenure and from the initial stages of the project timelines. CW 3 stated that the primary reason for the immediate cost overruns was that the Company had severely underbid the projects. CW 3 noted that her NASDI and GLDD superiors acknowledged these cost overruns from the outset of her involvement in these projects, with GLDD superiors stating that the projects were "unsalvageable."

41. For instance, CW 3 explained that, upon gaining responsibility for the Whitestone and St. George Ferry projects, CW 3 reviewed the contracts that governed NASDI's work on the projects and a variety of "job cost reports" to determine that the projects were impacted by costs that would exceed what the project had been bid for "from day one." In fact, on the very first day that work began on the Whitestone project, NASDI incurred an unforeseen $80,000 cost involving lead remediation. Apparently, it was necessary for lead in the bridge being demolished to be removed and which necessitated the hiring of a company that specialized in this work, but this cost had not been included in NASDI's estimates for the project and NASDI could not be reimbursed for these costs. Eventually, the lead remediation costs alone soared to $250,000—all

of which represented unrecoverable costs for NASDI. CW 3 also recalled numerous occasions when NASDI was not permitted to work on the project, but was nevertheless still obligated to pay for the labor costs of these specialized third-party contractors, which amounted to as much as $30,000 a day. According to CW 3, these kinds of issues were prevalent in the flawed New York operations, resulting in "***tons of change orders***" related to these projects. However, CW 3 stated that, "if you read the contracts," she doubted that the Company would be able to get paid for the change orders, and that the Company often found it necessary to fight legally to get paid.

42. CW 3 stated that due to these issues, the Whitestone project had "run out of money" within two or three months of its commencement and it was known that something was "severely wrong" with the project. CW 3 met with representatives from GLDD who told her that they were well aware the Whitestone project was operating at a great loss and that it would not be possible to reverse or totally remediate the losses, but that they wanted CW 3 to do her best to "stop the bleeding" on the project. By this time, the project was 60-65% completed and, although it had been bid at approximately $4.85 million, had incurred losses of $7.7 million. CW 3 described the Whitestone project problems as emanating from a "poorly reviewed" contract that was "poorly executed."

43. GLDD's major problems with the New York projects were no secret within the Company. In fact, CW 4, a former Project Manager / Estimator for GLDD's NASDI division who was employed at the Company between July 2010 and October 2012, corroborated many of CW 3's accounts regarding the Whitestone and St. George Ferry projects. As a Project Manager, CW 4 oversaw anywhere from 20 to 30 demolition projects for GLDD's demolition segment. During her tenure, CW 4 reported to NASDI Executive Vice President Mike Francis, President Berardi and his eventual replacement, NASDI President Marty Battistoni.

44.     CW 4 stated that she remembered that the Whitestone and St. George Ferry projects, along with the Whitney Museum project, were extremely troubled and resulted in massive cost overruns for the Company.   Specifically, CW 4 estimated that the Whitestone project had lost upwards of $7 million and that the St. George Ferry project had lost between $4 and $5 million.   CW 4 was not the estimator who had handled these two projects but she understood that the Company had ***deliberately underbid*** on projects in New York so that NASDI could become established in the New York market and fulfill GLDD's corporate objective to expand its footprint outside of the Massachusetts/New England area.

## 2.      *The Company Surreptitiously Masked NASDI's Cost Overruns And Artificially Inflated Its Financials*

45.     CW 3, the VP of Operations for the Company's NASDI division, explained the manner in which GLDD dealt with the massive cost overruns experienced in the New York projects.   CW 3 stated that she would regularly provide detailed updates regarding the status of the New York projects to a GLDD representative who was based in the NASDI Boston office, as well as NASDI officials, including Lombard, the NASDI controller.   In particular, expenses incurred by the New York projects were regularly conveyed to the Boston office.   In turn, on a bi-monthly basis in the middle and at the end of each month, CW 3 would receive a report from the Boston office setting forth all the costs that had been incurred during the prior two-week timeframe.   CW 3 was tasked with analyzing these "job cost reports" line item by line item, assigning a cost code and a job number to each item.   Specifically, CW 3 stated that there were three line items for these job cost reports—the bid or estimated cost for a particular item; the actual cost of the item; and the then-current estimated total costs that were expected at the time the project was expected to be completed.

21

46.     In addition to the bi-monthly job cost reports, CW 3 stated that she prepared additional reports on a monthly basis that provided a complete overview of the costs of the specific projects for which she had operational control—primarily, the New York projects.  CW 3 said that she received assistance from other employees in the preparation of these reports.  In addition, CW 3 confirmed that these reports were sent to NASDI Controller Paige Lombard, Executive Vice President Mike Francis and NASDI President.  After CW 3 provided the completed job cost reports and the monthly project status reports, NASDI Controller Lombard would formally account for expenses and revenues from an accounting perspective.

47.     In this manner, according to CW 3, GLDD and NASDI officials "knew long in advance if a job was going to be a bust" from a financial perspective.  Given the significant underbidding that plagued the New York demolition project contracts and the bloated expenses necessary to fulfill the Company's obligations pursuant to such contracts, CW 3 stated that the Company's practice to attempt to rectify cost overruns was to prepare claims for reimbursement of these additional costs—so-called "change orders."  CW 3 said that change orders were often used when the Company mishandles a project, incurs cost-overruns and tries to make up its losses.  CW 3 noted that in many instances, the Company would prepare change orders for which the client was under no obligation to honor since a particular contract did not contemplate the client having responsibility for a given expense.  CW 3 reiterated that a lot of claims for reimbursement were called change orders, but "good luck" if the Company actually received the reimbursement it was claiming.  Often times, the Company would either not get paid or would need to initiate legal proceedings in order to do so.

48.     Accordingly, in the months leading up to the Class Period, GLDD's demolition business was floundering.  Faced with a steady stream of disappointing and increasingly

unprofitable financial results, the Company placed an emphasis on expansion into the large New York demolition market as a means to rectify this downward trend. However, the combination of a severe underbidding on its New York projects, the unique New York labor requirements and the massive cost overruns for its projects ultimately led Defendants to cut corners in an attempt to mask the deficiencies in its operations.

49. Indeed, CW 4, the former NASDI Project Manager and Estimator, confirmed that NASDI officials routinely shifted costs from one project to another. CW 4 stated that NASDI Controller Lombard routinely moved around project costs so that money-losing projects could appear to be performing better than was actually the case. In fact, CW 4 participated in "billing meetings" that took place at the end of each month where these accounting manipulation were openly discussed. Present at these billing meetings, which lasted between 1 and 2 hours and took place in the NASDI Boston offices, were NASDI Controller Lombard, CW 4 and other NASDI and GLDD officials. The ostensible purpose of the billing meetings was for the Project Managers, Lombard and the other Company officials to review job costs. All of the different project job costs were set forth in a spreadsheet that was distributed by Lombard. Indeed, CW 3 confirmed that costs were shifted amongst the New York projects.

50. CW 4 stated that during these billing meetings it was Lombard's practice to routinely "***move money around***" from one project to another so that certain projects would look to be performing profitably or at least breaking even, when in actuality such projects were losing money. CW 4 confirmed that monies that were shifted from one project to another included job costs and revenues, and that the manner in which the monies were shifted from project to project depended on the nature of each project involved.

51.     In addition to acknowledging the cost overruns involved in the Whitestone and St. George Ferry projects, CW 4 also provided the Company's Whitinsville Powerplant project as an example of the cost and revenue shifting that occurred at the billing meetings.  CW 4 stated that the Whitinsville project had lost upwards of $600,000, but accounting manipulations during a billing meeting that she attended resulted in money from another project being shifted to Whitinsville in a manner that would make Whitinsville appear more profitable.  CW 4 said that various demolition projects, including another project—the Portsmouth Memorial Bridge project—"definitely had money moved around on it."  CW 4 stated that certain "consumable" materials for the project—approximately $200,000 worth of so-called "timber mats" that could not be re-used and therefore should be considered as a consumable item—were purposefully and wrongly classified as "permanent" assets that could thereby be capitalized.  Capitalizing these items meant that their cost would "not hit the job" and would therefore reflect better upon the project financials specifically and the Company generally.

52.     CW 4 confirmed that these accounting manipulations were discussed openly during the billing meetings and that "everyone knew" about these efforts to mask the unprofitably of certain projects.  CW 4 stated that she had been dismayed that moving costs and revenues from one job to another was a permissible and accepted practice at GLDD.  CW 4 often wondered how this practice of manipulating project costs and revenues could be allowed.  According to CW 4, Lombard would justify this accounting manipulation by stating that Defendants Biemeck and Berger wanted the numbers to "look good," and that they needed "to do right by Bruce and John" and "to do right by Marty," referred to Defendants Biemeck and Berger and NASDI President Battistoni, respectively.

24

### 3. *Defendants Were Well Aware Of And Approved Of GLDD's Fraudulent Accounting Manipulations*

53.     CW 4 stated that these business practices "troubled" her and that during the tenure of the NASDI Controller prior to Lombard, Lou Rivera, the Company did not manipulate job costs.  However, CW 4 stated that the accounting manipulations in GLDD's NASDI division began "right off the bat" when Lombard took over as NASDI's Controller, and that GLDD personnel, including Defendants Steckel and Biemeck, were frequent recipients of financial reports made by Lombard, Battistoni and other NASDI officials.

54.     Further expanding on these issues described by the other confidential witnesses is the account of CW 5, a former Staff Accountant in GLDD's Illinois headquarters who was employed at GLDD from January 2012 until May 2013.  CW 5's responsibilities included the preparation of property, plant and equipment schedules; balancing inter-company accounts—including accounts and projects for GLDD's demolition division—as well as overviewing and processing cost, payment and revenue information for NASDI and its receivables; preparing monthly bank reconciliations, and a variety of other functions.  At GLDD, CW 5 reported to Account Manager Mike Schill, Assistant Controller Cathy Hoffman, and Defendant Biemeck. CW 5 stated that these GLDD superiors, including Assistant Controller Hoffman, and along with NASDI Controller Lombard, were responsible for reporting the Company's demolition costs and revenues.  CW 5 also stated that Biemeck was involved in nearly all of the financial matters for GLDD because, in addition to his duties as CFO, Biemeck also took additional responsibilities during CW 5's tenure since GLDD operated without a controller for six months during 2012.

55.     CW 5 confirmed that there were definitely variances between the amounts that NASDI had billed its customers—amounts which were improperly booked as revenue—and the amounts that the Company would actually receive as payment for those bills.  CW 5 stated that it

was "well known" within GLDD that NASDI was "not very profitable" and that GLDD was transferring monetary amounts between divisions and directly paying NASDI expenses, including bills and in some instances employee salaries, in order to bolster the demolition segment's profitability and financial results. CW 5 stated that one of her duties included reconciling intercompany transactions to ensure that the balances were properly recorded between the Company divisions involved in the transactions. In fact, according to CW 5, by the end 2012, NASDI owed GLDD approximately $30 million as a result of these transfers, and by the end CW 5's tenure at GLDD, this amount had increased to approximately $35 million. According to CW 5, the large amounts of transfers—a fact to which most GLDD employees were not privy—were at odds with representations from GLDD's executives to general employees that the Company's demolition segment was "doing great."

56.     CW 5 stated that she was not surprised that the Company was forced to restate its financial results since GLDD was one of the most "unorganized organizations" that she had ever seen—a remark which is best exemplified by the fact that the Company operated for approximately six months during the Class Period without a controller. CW 5 stated that key individuals within the accounting department of GLDD were poorly qualified for their roles and some were not properly credentialed to have responsible accounting positions, including for some individuals the lack of a formal license as a Certified Public Accountant. CW 5 thus was not surprised of the Company's need to restate financial results due to these deficient internal controls and the fact that GLDD officials had demonstrated a willingness to cut corners and adopt questionable accounting maneuvers in the past.

57.     One such questionable accounting tactic, according to CW 5, occurred when a client would actually submit a payment for a project and it was unclear to which billing or

expense the payment should be applied. When CW 5 voiced confusion over this scenario, rather than seeking clarification from the client in order to avoid problems with future project payments, CW 5 was directed by her superiors at GLDD, including Hoffman, Schill and/or Biemeck, to apply the payment to the oldest pending receivable owed by that customer. CW 5 stated that although she did not agree with this accounting practice she was directed to comply with this edict.

58. CW 5 further recounted that she did not become aware of GLDD's actual need to restate its earnings until close to the end of the first quarter of 2013. CW 5 stated that it was GLDD's practice to have an "organizational meeting" about 3 months following the close of the preceding quarter to go over various aspects of the Company's financial and operational results. At the meeting near the end of the 2013 first quarter, CW 5 and other attendees were told about the restatement, that GLDD was "under investigation" and that the Company would likely face litigation as a result. Given the corner cutting and manipulations to which CW 5 had been privy, CW 5 was "not surprised" by this result. CW 5 further commented that, based on her experiences at the Company as well as the revelations of the restatement, she **believed that GLDD's shareholders were misled by the Company**.

59. Accordingly, during the Class Period, Defendants engaged in rampant accounting manipulations that resulted in the Company improperly recognizing revenue from its demolition segment, including by, among other illicit tactics, booking change orders as revenue even though client approval had not been obtained and actual payment for these amounts would likely not be attained. In addition, GLDD manipulating costs and revenues between its demolition projects in order to artificially enhance the financial metrics for certain projects. In turn, Defendants'

misconduct caused the Company to issue materially false and misleading statements during the Class period, which had the effect of artificially inflating GLDD's stock price.

## V.     THE TRUTH EMERGES

60.     On March 14, 2013, contrary to GLDD's previous assurances regarding the reliability of the Company's internal control over financial reporting, GLDD issued a press release announcing the restatement of its financials in which the Company's previously-issued financial statements from the Second and Third Quarters of fiscal 2012 should no longer be relied upon.  GLDD admitted that it had booked as revenue monetary amounts from unapproved change orders, despite the fact that "revenue from pending change orders . . . *is not recognized until the recovery is probable and collectability is reasonably assured*."  In addition, GLDD admitted that it expected to conclude that the Company had a "material weakness in its internal control over financial reporting," and that it would not be able to timely file its 2012 annual financial results with the SEC.

61.     In that same March 14, 2013 press release, the Company also announced without any explanation the well-timed and immediate departure of the Company's President and Chief Operating Officer, Defendant Biemeck, effective the day prior on March 13, 2013.

62.     On that same day, GLDD filed a Notification of Late Filing on Form 12B-25 with the SEC.  The Form 12B-25 provided in pertinent part the following:

> Great Lakes Dredge & Dock Corporation (the "Company") is unable to timely file its Annual Report on Form 10-K for the year ended December 31, 2012 (the "Form 10-K") without unreasonable effort or expense due to the circumstances described below.
>
> ***During the preparation of its year-end financial statements, the Company identified instances in its demolition segment where revenue was recognized in a manner not consistent with the Company's accounting policy. The Company's policy regarding pending change orders is to immediately recognize the costs but defer the recognition of the related revenue until the recovery is probable and collectability is reasonably assured. Certain pending change orders where***

*client acceptance has not been finalized were included as revenue. After a review, the Company concluded 2012 second and third quarter demolition segment revenues were overstated by $3.9 million and $4.3 million, respectively.* Due to the time expended on this review, the Company now requires additional time to finalize the presentation and review of its financial statements and will be unable to meet the filing deadline for its Annual Report on Form 10-K.

*The Company has determined that there was a failure of internal controls to detect or prevent misstatements in the financial statements and that such misstatements are material to the Company's results of operations for the quarterly and year-to-date periods ended June 30, 2012 and September 30, 2012*, but not to any prior interim or annual period. Therefore, the Company will restate its condensed consolidated interim financial statements via the filing of amended Quarterly Reports on Form 10-Q for the periods ended June 30, 2012 and September 30, 2012 prior to filing its annual audited financial statements with the Form 10-K. These amended Quarterly Reports will reflect the conclusion regarding 2012 second and third quarter demolition segment revenues described above and will also include adjustments to dredging operating income to record $1.3 million and $0.9 million of expenses previously capitalized and incurred in the preparation of vessels for the Wheatstone Australia LNG project.

*Management's review and assessment of the Company's disclosure controls and procedures and management's evaluation of the Company's internal control over financial reporting, which is ongoing, has identified a material weakness.* A "material weakness" is a deficiency, or a combination of significant deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

63.　　On this news, GLDD's common stock plummeted from a close of $8.97 per share on March 14, 2013 to $7.35 per share on March 15, 2013, a decline of 18% on unusually heavy trading volume. However, the Company's common stock remained inflated due to Defendants' continued false and misleading statements concerning the magnitude of the restatement and overall effects on the Company's business.

64.　　For instance, during the Company's earnings conference call on March 15, 2013, Defendants downplayed the significance of the restatement and GLDD's improper revenue recognition practices. Specifically, Defendant Berger stated the following regarding the Company's practices to prematurely book change orders as revenue:

We obviously had meaningful revenue recognition issues at our demolition segment. ***We believe a significant portion will be recognized in the future***. Our accounting policies and documentation procedures have been reviewed and we do not intend to have these compliance issues going forward.

We missed our adjusted EBITDA guidance that we provided in November by approximately $24 million. The majority of this shortfall was from the demolition segment where revenue recognized related to certain pending change orders was inconsistent with company policy. The total impact of this was approximately $13.5 million.

In addition to these adjustments, demolition was impacted by $2 million of cost overruns on other projects.

* * *

We'll be focusing on improving our controls at our demolition subsidiary and throughout the company. The demolition remediation segment is a key part of our growth strategy and we are committed to having the right personnel and tools in place to effectively grow the segment while maintaining adequate operational and financial controls.

65.     Similarly, Defendant Steckel provided the following comments regarding the

Company's accounting improprieties:

The demolition business was negatively impacted by pending change orders at projects where our accounting policy did not allow revenue to be recognized. ***We expect much of this revenue to be recognized in future periods***.

66.     Defendants Berger and Steckel participated in an exchange with an analyst in

which they downplayed the suspiciousness of booking change orders as revenue at this stage in

the Company's operational timeline, blaming the matter on typical payment delays (in Berger's

instance) and the complexity of the projects involved (in Steckel's instance):

<Q - Arnie Ursaner>: I want to try to focus on the – this whole issue of the change orders. ***Obviously, change orders occur in any construction-related, project-related business. They occur frequently. I can't imagine that it began this quarter. So, I guess, what we're trying to get a better feel for is, what exactly did change on a company-specific basis, when did it start to change?*** And then, I guess, the follow-up on that is, to the extent you had an issue in Q2 on a change order and it's eight months later and you haven't been paid, is there a different issue involved here?

<A - Jonathan W. Berger>: Yeah. I'll start and then, Bill, please back me up. Arnie, the biggest component of the two demolition projects are two large projects in the New York region. One of them started out as a $7 million project and it's over $22 million now, so the scope changed dramatically. And in that project, we are a subcontract to a prime who is contracted with a state agency. And as is the case in dealing with a prime working for the state, the prime won't pay you until he gets paid. So, we obviously performed all the work. We performed the work well, and ***it's a matter of having to work through and is typically the case***. They are going to fight you until they get their money, otherwise it comes out of their pockets, so you get sandwiched.

The second project is also a New York project where we're directly engaged with one of the agencies in New York City. And one of our subcontractors had a dispute with the agency and we've been stuck in the middle. ***We believe it will be resolved to everybody's satisfaction***. But until it is resolved, we just cannot recognize the revenue.

<Q - Arnie Ursaner>: Again, I think what we're all trying to get a better feel for, though, is you've been a subcontractor before and not been paid before. ***Why all of a sudden did you uncover that you had incorrect accounting at this point versus two years ago or three years ago***?

<A - William S. Steckel>: Arnie, ***these projects were significantly more complex than projects that we've worked on in the past***. And actually from the owner's perspective, were much more complex in terms of the contract changes. And really, that's the significant issue that was involved here. Our accounting policy is extremely conservative in terms of – if you look at the range of policies that you can adopt under GAAP, in that if we don't have fully agreed and fully approved change orders, we don't recognize revenue but we recognize all the cost. And clearly, we had a breakdown in terms of our control of when those revenues were recognized. And we've acknowledged that and we're going to fix that going forward.

67.    Immediately after Defendants' announcements and the resulting stock price decline, reaction from the investing community was decidedly negative. For instance, on March 19, 2013, an *Engineering News-Record* article by Richard Korman entitled "Great Lakes Restates Results After Booking Revenue Too Soon," stated the following:

Great Lakes ***officials would say only that most of the delayed payments involved change orders*** on work on two projects in the New York area. Great Lakes ***served as a prime contractor on one and as a subcontractor on the other.***

One analyst noted that Great Lakes had had problems with profitability on demolition work before. "***Here we are back at demolition issues***," the analyst

suggested. "***Demolition by its nature is a lot more competitive and the projects complicated***."

68.     On March 22, 2013, a *The Street* article by Gregg Greenberg entitled "5 Dumbest Things On Wall Street This Week," stated the following:

> Shares of the dredging company devolved into dreck last Friday, sinking 18% to $7.40 after the company announced it will restate its second- and third-quarter results due to accounting issues. Great Lakes apparently recorded some revenue for its demolition business in a way that did not comply with its own policies. ***The company revealed it overstated second-quarter revenue by $3.9 million and third-quarter revenue by $4.3 million. It also said it will review $5.6 million in questionable fourth-quarter sales***.

<div align="center">* * *</div>

> Basically, to drop the accounting jargon, the company that makes its money destroying things lit the dynamite, yet forgot to run.

> Well, that's not entirely true. ***Great Lakes said its President, COO and former CFO Bruce Biemeck is taking off in the wake of the accounting blow up***.

69.     On April 15, 2013, a *Crain's Chicago Business* article by Paul Merrion entitled "How Great Lakes Dredge Mucked It All Up," noted that GLDD's "corporate governance raises some red flags" and questioned both the inter-relatedness of the Company's Board and the propriety of its decision to allow Defendant Biemeck to collect a robust severance package:

> Oak Brook-based Great Lakes Dredge & Dock Corp. has hit a shoal of investor dismay and shareholder litigation after accounting snafus forced it to restate results from last year's second and third quarters, delay its annual report, default on a loan covenant and jettison a longtime executive who had been both president and chief financial officer until August.

> But that's only part of the reason its stock sank when the bad news broke last month. The company acknowledged $2 million in cost overruns, lower-than-expected profits on several projects and its failure to sell a dredge that was supposed to bring in $4 million. All in all, cash flow was $24 million short of what analysts were led to expect in November, and predictions of a modest profit turned into a loss of $3.3 million on revenue of $687.6 million. The loan default was waived, but the bank got a first lien on several vessels and all accounts receivable.

<div align="center">* * *</div>

"*This was poorly handled*," says Jonathan Tanwanteng, an analyst at CJS Securities Inc. in White Plains, N.Y., who downgraded his "bullish" recommendation to "neutral." "It's now a show-me stock. They have to show they can get past these issues."

\* \* \*

Still, *the firm's corporate governance raises some red flags*. The board's audit committee includes an ex-congressman from Florida who investigated Enron Corp.'s massive fraud, but no accountants. Mr. Berger, the CEO, is a cousin of Nathan Leight, chairman of the board, and the firm's secretary, chief legal officer and chief compliance officer, Kathleen Lavoy, is the daughter of Douglas Mackie, a non-executive director who was CEO before Mr. Berger replaced him in 2010.

From 2010 until last August, when a full-time chief financial officer was hired toward the end of the two quarters when accounting mistakes occurred, Bruce Biemeck was both president and CFO. His departure last month as president and chief operating officer was "*not for cause*," the company said, *which allowed him to collect a hefty severance package*.

70.     On May 7, 2013, GLDD filed with the SEC a Form 8-K in which Defendants continued to minimize the fallout from the Company's accounting improprieties and continued to omit material information regarding the full scope of GLDD's fraud. For instance, Defendant Steckel stated the following in the Form 8-K:

With regard to our demolition segment, we continue to focus on improving execution and internal controls to deliver better results. The first quarter was negatively impacted by *delays in three projects* resulting in a shift of $7 million of revenue into the remainder of 2013. In addition, *another project experienced unexpected cost overruns.* We are dedicating significant corporate resources and working with division management to improve execution and results of this segment.

71.     Defendant Berger was similarly unforthcoming in the Form 8-K:

The demolition segment will require additional time and expense to improve operations and deliver better results. *We see numerous demolition and environmental remediation opportunities on the horizon*, and we will be measured in our approach and selectively target those projects we believe that we can execute well.

72.     Also on May 7, 2013 the Company held an investor conference call to discuss its 2013 first quarter financial results. Defendant Berger stated the following with regard to the

cause of the Company's lower gross margins in its demolition segment and the increased controls that GLDD had implemented, further demonstrating the lack of adequate internal controls at the Company during the Class Period:

> Q: First question is on demolition with – you mentioned the lower gross margins were impacted by cost overrun in the quarter. Is that – first off, can you quantify it? Secondly, is it associated with some of the old projects that you had issues with in 4Q, or is it something new?

> A - Jonathan W. Berger: One, on a specific project I don't think we quantify. But ***the biggest overrun was just honestly a missed estimate. A missed estimate on a significant job, and it was a new one. It was not the projects that we had our revenue reversals on that we talked about significantly*** in the ones in New York and that, Trey.

> Q: Okay. And some of the things that you guys are putting in place, the controls that you guys are putting in place, I guess, would that – I mean, did this surprise you? Would you expect to see more of this going forward? Or are we at a point where we can start to think about this type of thing being a thing of the past, or at least not coming up as regularly?

> A - Jonathan W. Berger: ***We certainly put in significantly more controls***. And I assume that – as a regular thing we will control and have second and third reviews on estimates, but it's a contracting business. We'll have ups and downs, but I sure hope that we don't have the magnitude of these going forward.

73.     Even after recognizing that the Company improperly bid on a project distinct from the trouble New York projects and disclosing that the Company suffered a loss in connection with this new project as a result of poor bidding, Defendant Berger continued to make false assurances regarding the Company's demolition segment in an exchange with an analyst:

> Q - Jamie Yackow: Nice quarter on the dredging side. I mean, not to beat a dead horse, but on the demolition side, I mean, maybe you guys – can you guys elaborate a little more specifically what went wrong with the business that caused the shortfall? Are the bidders still with the company? Is this project completed? If it's not when do you expect it to be completed? What are the expenses going forward?

> A - Jonathan W. Berger: Yeah. Project runs through the second quarter. ***We have certainly put way more better controls in the bidding process.*** The bid miss has

to do with actually recovery of metals. And we've certainly – *are shoring up our processes to make sure that misses like that don't happen.*

74.     The full extent and repercussions of Defendants' fraudulent revenue recognition scheme finally came to light after the close of market on August 7, 2013.  On this date, GLDD announced financial results for the three and six months ended June 30, 2013, including an overall net loss of $25.2 million, a $21.5 million noncash charge for goodwill impairment related to the demolition segment, and the revelation that the Company was required to move up its goodwill impairment test to the second quarter as a result of its deficiencies in the demolition segment.  The Company's announcement provided in pertinent part as follows:

> *Quarter results also included an estimated noncash charge of $21.5 million, which represented all the goodwill associated with our NASDI and Yankee demolition subsidiaries*. We typically test goodwill for impairment in the third quarter, however, *due to a decline in the overall financial performance and declining cash flows in the demolition reporting unit, we concluded there was a triggering event that required us to accelerate the test to the second quarter*. We wrote down the value of goodwill related to this reporting unit by $21.5 million, reflecting our best estimate of impairment at this time. We are currently completing our detailed valuation of the demolition segment assets and liabilities, and will finalize the impairment measurement in the third quarter.
>
> * * *
>
> Additionally, we determined that *certain pending change orders for one demolition project no longer qualify for revenue recognition according to the Company's accounting policy. In June we filed a lawsuit against the project's general contractor to preserve our contractual rights while we pursue payment for the work performed under these change orders*. As a result of the new developments related to the project, which also include recent communications with the general contractor and site owner, *we reversed revenue of $5.6 million that was previously recognized for the project*. We continue our efforts to achieve a favorable outcome related to these change orders.

75.     On August 8, 2013, Defendants Berger and Steckel participated in a conference call to discuss the Company's earnings.   During the call, Defendant Steckel provided the following comments regarding the Company's disclosures of additional change-order revenue recognition issues:

There were however two significant items that impacted the second quarter results for demolition.

The first was the non-cash write-off of $21.5 million of goodwill. Continuing losses and declining expected cash flows prompted up to accelerate the test for goodwill impairment into the second quarter. As a result of this testing, we recorded an estimated charge in Q2. We will complete our analysis of the NASDI goodwill and finalize the impairment amount in the third quarter.

We also identified certain pending change orders for one demolition project which no longer qualified for revenue recognition according the companies accounting policy. New developments in June including filing losses against the projects general contractor to preserve our contractual rights and we received additional communication from the general contractor and the owner.

Our accounting policy allowed us to record revenues in early periods, however as a result of these new developments; we appropriately reverse revenue of $5.6 million in the current period. We continue our efforts to achieve a favorable outcome related to these changed orders and are currently working with the general contractor and the owner in this regard.

76. Defendant Berger had the following exchange with an analyst regarding the progress of the Company's demolition segment remediation in which he cast blame on previous management *from over two years prior*:

<Q - Trey Grooms>: Okay. And looking -- I guess looking at the Demolition business.

<A>: Yeah.

<Q - Trey Grooms>: You mentioned making a decision on something by year end, what are the different options you are looking at here?

<A>: Sure, and fair question. May be I could take this opportunity to step back give you a little bit more color on how I see the Demolition business. And I will give you that based on my experience of 30 years and a certain – a reasonable amount of work and we are shaping company that have gone through a significant issues.

It's kind of we step profit, no different than I have somewhere a car accident, you treat out, you *stop the bleeding*, you diagnose the problem and then you treat the problem. And I think we need to remind everybody that situation where we've had *management for over 10 years in that company that was acting in a manner that we certainly could not operate under*. So, we turned over on the call the executive management as soon as we've report to the operating management and this occurred in April 2011 and *we are still chasing down issues led by prior*

*management and I think most of those from an operating perspective are close to my knowledge just the clean up, and that includes our internal controls, many tailing legal issues and the calls that needs to be changed.* So we focused tremendously in this last six months. But what do we have to say and what we have see minimal slippage in contract margin, I think we're bidding work. We're getting the type of work we like and see very good opportunities and we're getting margins that are acceptable to us right now.

77.     Defendant Berger had the following exchange with an analyst revealing that the

Company had not recouped a significant portion of the improper revenue previously recognized

in the demolition segment financials:

<Q - Rick D'Auteuil>: I just have a feel to, on the issues that came up on the fourth quarter call related to the demo business concentrated on a couple of the projects. I think you had some recovery in the last quarter my recollection was a million or million something. Anything in this quarter related to the hits we took and then at that time you said you are still expected to collect do you still hold that opinion?

<A>: Yeah in the second quarter, Rick *there was no activity related to the things that we reverse or wrote down at year end that came back in to the financials.* And in terms of moving forward I mean we still think we will collect a significant portion of this it's a very aguish process and we've kind of force the issues as we disclosed we've filed the lawsuit against the GC and we are doing some other things there. But we still expect to collect significant amount of money from those.

\* \* \*

<Q - Rick D'Auteuil>: You said you expect a better half in the second half in the demo business. I mean, *it can't be any worse than what you guys have done so far.* So with Terra does that mean -- and the recognitions on all the identified bad contracts or projects, do you think we can approach breakeven in this second half if you have thrown Terra and their contribution?

<A>: Well, *we said what our given guidance and that's really all we can say about it.* We expect the revenue to pickup in the second half if you look at the backlog. If you look at what we announce in terms of Terra and Great Lakes joining together and start to work on that nice project up in Michigan. Those are all going to be good contributors but that's really all we can comment on at this time.

<Q - Rick D'Auteuil>: Right. So let me come out it from a different angle, if you've identified. If there's no new problems going into the mix and you've identified all of the existing problems and business is picking up on the top line, I

guess how do we have significant losses with that being scenario that you guys have painted?

<A - Jonathan Berger>: Yeah. I mean I don't think we'd have significant losses. I mean I don't think Bill and myself for the management at there expect anything like what we've gone through for the last year.

\* \* \*

<Q>: Anthony Robb>: Okay, thanks. Just one more if you don't mind. On demolition, I think you've – identify Q4 is the point in time where you decided which direction to go. What do you think the asset were and is it such that you would have to split the business up in it sale or you could think – you think there's a buyer for the whole piece?

<A>: The assets, I mean, I was looking at our balance sheet.

<A>: We disclose some segment. You might be out in the queue.

<A>: And that will be – if you give some idea that book value of the asset. Would there be a buyer or is just asset sale. Just a sale of the assets. Very good question. **We have a lot legacy issues that we wouldn't go to get rid off from a buyer**.

78.    Following these stunning announcements, GLDD's stock price plummeted again, this time trading at a 52-week low of $6.28 per share on August 8, 2013, representing a decline of 16% on unusually heaving trading volume.  In fact, for the two-day trading period surrounding these announcements, the Company's stock price was down 20% on intra-day trading.

79.    Accordingly, Defendants' fraudulent accounting scheme and improper revenue recognition practices materially altered GLDD's Class Period financial results.  Defendant Biemeck was quickly ushered into an immediate departure from the Company, GLDD had to restate two quarters of its financial statements, and the Company's shareholders lost millions of dollars from their investments in the artificially inflated GLDD common stock.

## VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### A.    FALSE STATEMENTS REGARDING FINANCIAL CONDITION AND OPERATING RESULTS

80.    Throughout the Class Period, the Company and the Individual Defendants regularly made statements concerning the state and expectation of GLDD's finances and operations.  Defendants reported false financial results and made false and misleading assurances regarding those results based on Defendants' fraudulent project costs and revenue in their demolition business.  The original false financial results, the restated financial results, and Defendants' false and misleading statements concerning GLDD's financial and operational results during the Class Period are presented below.

#### 1.    *Second Quarter 2012 False And Misleading Statements*

81.    On August 7, 2012, the Company issued a press release disclosing its second quarter 2012 financial results for the quarter and six months ended June 30, 2012.  The Company stated:

> Revenue increases included:
>
> * * *
>
> o  ***Demolition revenue increase of 6%, from bridge demolition work and a large site development project in New York***;
>
> * * *
>
> Gross profit margin (gross profit divided by revenue) improved due to:
>
> * * *
>
> o  ***Improved demolition results***

82.    Moreover, Defendant Berger commented that "[t]he demolition segment continues to perform on its projects in backlog.  ***A large portion of the demolition backlog earned in the quarter relates to new management's focus on large complex projects with higher margins***, such as bridge demolition and industrial, municipal and utility buildings."

83.    Defendant Biemeck was also quoted in the press release as follows:

*The demolition business had a strong start to the year, demonstrating that sound project estimating and execution improve results*.  The new management team in this business is working diligently to add opportunities leading to growth by elevating the range of professional services offered through a more capable support team. The successful partnership of our demolition and dredging businesses is an important component to our Company's growth as evidenced by the recent focus on bridge demolition and salvage work required under some projects, which was formerly sub-contracted outside the Company.

84.     The above statements were false and misleading because the Company's financial figures and alleged performance of the demolition segment were not a result of an *actual* improvement in the Company's demolition business or a result of "sound project estimating and execution," but instead were falsely obtained through illicit accounting manipulations and improper revenue recognition, as described herein.

85.     On August 7, 2012, GLDD filed its Form 10-Q for the second quarter of fiscal 2012 for the period ending June 30, 2012, that stated the following Company financial results:

The Company's financial reporting systems present various data for management to run the business, including profit and loss statements prepared according to the segments presented. Management uses operating income to evaluate performance between the two segments. Segment information for the periods presented is provided as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2012 | 2011 | 2012 | 2011 |
| **Dredging** | | | | |
| Contract revenues | $134,772 | $125,085 | $257,133 | $261,682 |
| Operating income | 12,974 | 13,594 | 17,873 | 31,415 |
| **Demolition** | | | | |
| Contract revenues | $ 31,760 | $ 29,874 | $ 64,306 | $ 48,615 |
| Operating income (loss) | (448) | (4,937) | 1,439 | (7,147) |
| **Total** | | | | |
| Contract revenues | $166,532 | $154,959 | $321,439 | $310,297 |
| Operating income | 12,526 | 8,657 | 19,312 | 24,268 |

86.     Regarding revenues, Defendants failed to disclose to investors that but for the improper recognition as revenue of unapproved change orders, year-over-year revenues would have been significantly lower in the second quarter of 2012:

| Demolition Segment Revenues For the Quarter Ended: | June 30 |
|---|---|
| As originally reported, 2012 | $31,760 |
| $ change | (3,425) |
| As restated, 2012 | 28,335 |
| | |
| As reported, 2011 | 29,874 |
| Year over year (decrease) | (1,539) |

87.     In addition, the Company's MD&A made the following statements regarding the revenue for operating and financial results:

> Through increased collaboration with Great Lakes' other lines of business, the demolition operations continue to expand into the New York area and marine demolition markets, *specifically bridge demolition*. In the first six months of 2012, *demolition revenues accounted for 20% of total revenues, above the prior three year average of 12%.*
>
> * * *
>
> *Demolition revenue for the quarter was $31.8 million, a 6% increase* from $29.9 million a year ago. Revenue for the six months ended June 30, 2012 was up $11.1 million compared to the prior year, *primarily due to an increase in demolition revenue.*
>
> * * *
>
> *Demolition*
>
> Demolition revenues for the three and six months ended June 30, 2012 totaled $31.8 million and $64.3 million, respectively, compared to $29.9 million and $48.6 million for the same 2011 periods. The demolition segment experienced *higher revenue levels in 2012 driven by bridge demolition work and a large site development project in New York as new demolition management has focused on large projects with higher margins in the current yea*r.

88.     Also on August 7, 2012 the Company held an investor conference call to discuss its 2012 second quarter financial results.   Defendants' continued to make statements that fraudulently omitted material information regarding the Unapproved Change Orders component of Great Lakes' earnings.   During the conference call, Defendant Berger stated in pertinent part:

> Let's turn to demolition for a minute. Both our whole management team and the board is very happy with the turnaround we implemented in the business from a year ago. ***Revenues are up, as Bruce said, and our margins are positive.*** We expect to work off certain low margin projects from legacy management and to continue to improve our margins. And strategically, our demolition business has moved beyond its core regional business in New England, New York and into new markets, bridge demolition, brownfields, utilities and working with our dredging business. ***So, we feel very good strategically where we've positioned that business*** and ***we look to continue to grow*** that business along the lines of remediation and environmental work.

89.     During the call, Defendant Berger had the following exchange with an analyst regarding growth potential and margins in the demolition segment:

> Jamie Yackow of Mob Partners
>
> Okay. All right, Thanks. And then secondly, just on in terms of the demolition side, how do you guys look at the growth potential in that business?
>
> A - Jonathan W. Berger: Yes, I mean we've set a three-year plan to be $200 million in that business.  And I think if you look at where they are through the first half of the year, ***they were somewhere what north of $60 million in revenue.*** We think as we move into the remediation side, we think strategically there's probably some obviously significant growth there and I think there's also potentially some small acquisitions we can add to give us some new geographic coverage and some skill set. So we're very high on that whole market as part of our strategy to get that to be a wholesome second leg of ours.
>
> Q: And what type of margins, do you guys think you can achieve?
>
> A - Jonathan W. Berger: On the operating side, ***I think it will be similar to our dredging margins.***

90.     Defendants' reported financial results for the Company provided no clarification or disclosure that, without Defendants' illicit accounting manipulations and improper revenue recognition from unapproved change orders, GLDD's operating income would have actually

42

decreased approximately 41% (from $12.5 million to $7.3 million), not increased 43.7% (from $8.7 million to $12.5 million). Moreover, without the improper recognition of change orders and unapproved claims, GLDD's gross profit margin would have been only 11%, rather than 14.4%.

91.     On September 20, 2012, Defendant Berger presented at the Imperial Capital Global Opportunities Conference on behalf of the Company, regarding the Company's business and prospects, wherein he fraudulently omitted material information regarding the Unapproved Change Orders and their impact and contribution to the alleged success of the Company's demolition segment. Defendant Berger stated as follows:

> Additionally, we had to turnaround our demolition business. We looked at that two years ago, and it was – frankly, a disaster. It was losing money. We didn't like management. They weren't focused in the right areas. **We went in, we turned it around in the last six months to a year and now we have a focus in the market that we like**. We think it's growing. It's taking on a client base that we think is very attractive, taking on work with the utilities, and we think there'll be a lot of work there, looking beyond pure demolition, getting back into the site development story of NASDI, which is remediation of land, and we think that's a real growth area, and **we believe that the company will double in size in the next three to four years with increased profitability**. And we're looking to grow.

92.     Defendant Berger further continued making false statements regarding the demolition segment, stating that, "[w]e have talked about demolition, probably—***it's growing now, it's profitable again.***"

93.     The above statements were false and misleading because Defendant Berger knew that the demolition business had not been "turned around" and was not "profitable again" but in fact was suffering from the cost overruns and accounting problems described herein.

94.     On October 11, 2012, Defendant Steckel presented at the Deutsche Bank Leveraged Finance Conference on behalf of GLDD regarding the Company's business and prospects. During this presentation, Steckel fraudulently omitted material information regarding the GLDD's improper revenue recognition derived from unapproved change orders and their

impact and contribution to the alleged success of the Company's demolition segment.  With

regard to the demolition business, Defendant Steckel stated the following:

> This business—and again this is news that's out there about the company. We had
> to do some turnaround in this business. We had some projects that weren't bid
> particularly effectively. ***We've done that turnaround work.*** Most of those
> projects that were kind of tough-margin projects for us. ***The work has certainly
> wrapped up. We're closing out those projects.*** There is some work to get them
> actually wrapped up and claim settled and what not, ***but that business has been
> turnaround and is ready to really kind of go forward now*** and do some great
> things. So we're excited about it.

95.     All of Defendants' above statements disseminated during the Second Quarter of

2012 were additionally false and misleading for the following reasons:

>   a.     GLDD's expansion into the New York area, specifically in bridge
>          demolition, had not actually experienced that amount of revenue increase
>          because the claimed revenue was based on a fraudulent accounting
>          modification that included improper revenue recognition from unapproved
>          change orders;
>
>   b.     The Company failed to disclose that the growth in revenue of 6% from the
>          prior year, and increased contribution to the company of 20% over the
>          12% three year average was attributed to this accounting modification in
>          the New York projects that falsely inflated revenue.   Without this
>          disclosure, the Company's information was false and misleading because
>          it established that the demolition segment's operating and financial
>          success was due to the new management's focus on large projects with
>          higher profit margins, when in fact it was continuing to lose money on the
>          same projects in the New York;
>
>   c.     The Company was experiencing known, but undisclosed, material losses
>          on projects in the New York region, which were having a material adverse
>          effect on GLDD's revenues and operating income, particularly as in
>          relation to the Company's NASDI demolition division.  For instance, CW
>          1, Former Vice President of Operations for NASDI who was responsible
>          for overseeing the Company's New York demolition projects, confirmed
>          that the projects were underperforming and experienced significant cost
>          overruns from the onset, and that GLDD and NASDI executives were
>          "***well aware***" and were "***concerned***" about the costs incurred on the New
>          York projects;
>
>   d.     As a result of the ***actual*** poor performance of these projects in the
>          demolition segment, the Company improperly recognized millions of
>          dollars of revenue from change orders, all the while knowing that the

44

collection of those change orders was contractually problematic and unlikely, and while knowing that there was no way to accurately estimate what amount, if any, could ultimately be collected under any circumstances;

e.     The Company failed to properly account for cost overruns under the percentage-of-completion method under GAAP (as explained below in Section VII) and contrary to its representations regarding its accounting practices, thereby inappropriately failing to recognize losses and providing investors with the impression that the Company was performing financially better than it truly was;

f.     The Company was engaging in improper accounting of its accounts receivable as a result of recording revenue from pending change orders where client acceptance had not been finalized and therefore was overstating its demolition segment revenues as a result;

g.     The Company was overstating its accounts receivable and therefore its demolition segment revenues as a result of Defendants' improperly reducing the Company's allowance for doubtful accounts during the Class Period contrary to GAAP;

h.     The Company was overstating the goodwill in the demolition segment, and notwithstanding the declining earnings and obvious changes in business conditions (as discussed above), Defendants continued to misrepresent the value of the goodwill in the Company's demolition segment by approximately $21.5 million in direct contravention of GAAP and the Company's stated accounting practices;

i.     Defendants failed to disclose known trends and uncertainties in violation of SEC regulations as a result of improperly recognizing revenue from change orders during the Class Period, thus providing the impression that the demolition segment was growing and performing substantially better than what it actually was;

j.     The reports of former employees of the Company's NASDI division also confirm the Company's false financial results and that well before the Class Period that GLDD's demolition division routinely was not paid for reimbursements from change orders.  For instance, CW 3, a former VP of Operations for NASDI, who was tasked with providing regular updates of the status of the New York projects, stated that the Company attempted to rectify cost overruns with "***change orders***" but "***good luck***" if the Company actually received reimbursement;

k.     CW 1, CW 2, CW 3 and CW 4 corroborated the fact that several New York projects, including the Whitestone and St. George Ferry projects, were severely and intentionally underbid, and that they were immediate

financial disappointment. CW 2, the former Business Development Estimator at NASDI, confirmed the Company's bidding practices to the extent that demolition executives submitted bids that did not reflect CW 2's estimate, which took into account the unique nature of New York's labor rates when providing estimates for New York projects. However, as the former employees attest, the projects were ultimately bid at under-budget levels and, as CW 2 stated, were a "*different story*" from her estimates;

l.　　CW 3 further elaborated that her GLDD superiors knew of the cost overruns "*from day one*," that they represented to her that the projects were "*unsalvageable*" and that she was directed merely to "*stop the bleeding*." CW 3 also recounted that the Whitestone project had "*run out of money*" within two or three months of its commencement and it was known even before that time that something was "*severely wrong*." CW 3 received direction from GLDD executives to "*stop the bleeding*" on the Whitestone project; and

m.　　CW 4, a former NASDI Project Manager and Estimator, stated that it was NASDI Controller Lombard's practice to routinely "*move money around*" from one project to another to create a façade that costly projects were profitable. CW 4 also confirmed that "*everyone knew*" about such accounting manipulations, with the practice openly discussed during billing meetings and that the business practices *troubled her*. With GLDD's major problems being no secret within the Company, CW 4 confirmed CW 3's accounts regarding the deliberate underbidding on projects, as well as the Whitestone project information; and

n.　　CW 5, former GLDD Staff Accountant, confirmed the Company's accounting manipulations, stating that there were *definitely variances* between the amount that NASDI had billed its customers and the amounts that the Company would actually receive as payment.

### 2.　　*Third Quarter 2012 False And Misleading Statements*

96.　　On November 6, 2012 the Company issued a Press Release discussing its 2012 third quarter financial results for the quarter and nine months ended September 30, 2012. Defendant Berger stated that, "[a]fter several strong quarters, *the demolition segment's results were negatively impacted by cost overruns caused by weather and scope changes* outside those allowed to be reimbursed under the contract. These impacts lowered the demolition gross margin by over 9% *and were limited to the third quarter*." In the same press release, the

Company further reported that revenue increases in the quarter included (among other things): "*[d]emolition revenue increased 17% due to concluding work on two New York projects[.]*" With regard to overall revenue, the Company further stated that, "[y]ear to date *2012 revenue increased primarily due to higher demolition revenues* year to date while dredging revenues were in line with the same period in 2011[.]"

97.     Also on November 6, 2012, the Company held an investor conference call to discuss its 2012 third quarter financial results. Defendants' continued to make statements that fraudulently omitted material information regarding the Unapproved Change Orders component of Great Lakes' earnings. Defendant Biemeck represented that:

> The demolition business led off with a strong start in the first 6 months of this year with revenue of $64.3 million, but experienced a bump in the third quarter with certain project cost overruns and a reduction in the price of scrap steel. Demolition sells a significant amount of scrap from projects, and the price of steel impacts margins.

> September 30 year-to-date, demolition gross profit margin was 5.9%, compared to 2.2% for the same period in 2011. As noted in the earnings release, *we did not feel this is indicative of any negative trends in the demolition business*.

98.     During the call, Defendant Biemeck had the following exchange with an analyst regarding the demolition segment:

> John F. Kasprzak - BB&T Capital Markets, Research Division

> That's great. Last question, on demolition, do you think the issues that hurt margin in Q3 are behind that business?

> A - Bruce J. Biemeck**:** I believe they are. I mean a couple of these were projects that have lingered on a bit. One of them or two of them were projects that we inherited a couple of years ago. And yeah, I think as we are bidding on and the kind of – and the kind of work we are bidding on and the business that we are seeing these days and the work that we picking up is – looks different *and we have improved our estimating and cost tracking system, particularly our estimating significantly.*

> *And I think we have a better feel for how to bid on these and how to make sure that the right amount of risk is built into the estimate.* So, yeah I do, I think that

47

as we are seeing projects and as we are looking at what's available in the future; it feels as though we are definitely headed toward better projects, better customers and more consistent margins.

99.     On the next day, GLDD filed its Form 10-Q for the third quarter of fiscal 2012 for

the period ending September 30, 2012, stating the following financial results:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2012 | 2011 | 2012 | 2011 |
| **Dredging** | | | | |
| Contract revenues | $ 138,811 | $ 134,591 | $ 395,944 | $ 396,273 |
| Operating income | 2,687 | 13,593 | 20,560 | 45,008 |
| **Demolition** | | | | |
| Contract revenues | $ 27,952 | $ 23,877 | $ 92,258 | $ 72,492 |
| Operating income (loss) | (1,226) | 1,193 | 213 | (5,954) |
| **Total** | | | | |
| Contract revenues | $ 166,763 | $ 158,468 | $ 488,202 | $ 468,765 |
| Operating income | 1,461 | 14,786 | 20,773 | 39,054 |

100.     Regarding revenues, Defendants failed to disclose to investors that but for the

improper recognition as revenue of unapproved change orders, year-over-year revenues would

have been significantly lower in the third quarter of 2012:

| Demolition Segment Revenues For the Quarter Ended: | Sept. 30 |
| --- | --- |
| As originally reported, 2012 | $27,952 |
| $ change | (4,279) |
| As restated, 2012 | 23,673 |
| | |
| As reported, 2011 | 23,877 |
| Year over year (decrease) | (204) |

101.     In addition, the Company's MD&A made the following statements regarding the

revenue for operating and financial results:

Through increased collaboration with Great Lakes' other lines of business, the demolition operations continue to expand into the New York area and marine

48

demolition markets, *specifically bridge demolition*. In the first nine months of 2012, *demolition revenues accounted for 19% of total revenues, above the prior three year average of 12%.*

* * *

Demolition revenue for the nine months ended September 30, 2012 *increased $19.8 million, or 27% compared to the prior year adding to the increased total revenues for the Company.*

* * *

Demolition

Demolition revenues for the three and nine months ended September 30, 2012 totaled $28.0 million and $92.3 million, respectively, compared to $23.9 million and $72.5 million for the same 2011 periods. *The demolition segment experienced higher revenue levels in 2012 driven by bridge demolition work and large site development projects in New York as new demolition management has focused on large projects with higher margins.*

102.    The above statements were false and misleading because Defendants knew that the negative demolition segment results which were "negatively impacted by cost overruns" and "scope changes" were not "limited to the third quarter" but in fact, as exposed in the Company's restatement, GLDD's financial results, including its demolition segment results, were also impacted throughout the Class Period.

103.    In addition, all of Defendants' above statements disseminated during the Third Quarter of 2012 were additionally false and misleading for the following reasons:

       a.     GLDD's expansion into the New York area, specifically in bridge demolition, had not actually experienced that amount of revenue increase because the claimed revenue was based on a fraudulent accounting modification that included improper revenue recognition from unapproved change orders;

       b.     The Company failed to disclose that the growth in revenue of 6% from the prior year, and increased contribution to the company of 20% over the 12% three year average was attributed to this accounting modification in the New York projects that falsely inflated revenue. Without this disclosure, the Company's information was false and misleading because it established that the demolition segment's operating and financial

success was due to the new management's focus on large projects with higher profit margins, when in fact it was continuing to lose money on the same projects in the New York;

c.    The Company was experiencing known, but undisclosed, material losses on projects in the New York region, which were having a material adverse effect on GLDD's revenues and operating income, particularly as in relation to the Company's NASDI demolition division. For instance, CW 1, Former Vice President of Operations for NASDI who was responsible for overseeing the Company's New York demolition projects, confirmed that the projects were underperforming and experienced significant cost overruns from the onset, and that GLDD and NASDI executives were "***well aware***" and were "***concerned***" about the costs incurred on the New York projects;

d.    As a result of the ***actual*** poor performance of these projects in the demolition segment, the Company improperly recognized millions of dollars of revenue from change orders, all the while knowing that the collection of those change orders was contractually problematic and unlikely, and while knowing that there was no way to accurately estimate what amount, if any, could ultimately be collected under any circumstances;

e.    The Company failed to properly account for cost overruns under the percentage-of-completion method under GAAP (as explained below in Section VII) and contrary to its representations regarding its accounting practices, thereby inappropriately failing to recognize losses and providing investors with the impression that the Company was performing financially better than it truly was;

f.    The Company was engaging in improper accounting of its accounts receivable as a result of recording revenue from pending change orders where client acceptance had not been finalized and therefore was overstating its demolition segment revenues as a result;

g.    The Company was overstating its accounts receivable and therefore its demolition segment revenues as a result of Defendants' improperly reducing the Company's allowance for doubtful accounts during the Class Period contrary to GAAP;

h.    The Company was overstating the goodwill in the demolition segment, and notwithstanding the declining earnings and obvious changes in business conditions (as discussed above), Defendants continued to misrepresent the value of the goodwill in the Company's demolition segment by approximately $21.5 million in direct contravention of GAAP and the Company's stated accounting practices;

i.    Defendants failed to disclose known trends and uncertainties in violation of SEC regulations as a result of improperly recognizing revenue from change orders during the Class Period, thus providing the impression that the demolition segment was growing and performing substantially better than what it actually was;

j.    The reports of former employees of the Company's NASDI division also confirm the Company's false financial results and that well before the Class Period that GLDD's demolition division routinely was not paid for reimbursements from change orders. For instance, CW 3, a former VP of Operations for NASDI, who was tasked with providing regular updates of the status of the New York projects, stated that the Company attempted to rectify cost overruns with "***change orders***" but "***good luck***" if the Company actually received reimbursement;

k.    CW 1, CW 2, CW 3 and CW 4 corroborated the fact that several New York projects, including the Whitestone and St. George Ferry projects, were severely and intentionally underbid, and that they were immediate financial disappointment. CW 2, the former Business Development Estimator at NASDI, confirmed the Company's bidding practices to the extent that demolition executives submitted bids that did not reflect CW 2's estimate, which took into account the unique nature of New York's labor rates when providing estimates for New York projects. However, as the former employees attest, the projects were ultimately bid at under-budget levels and, as CW 2 stated, were a "***different story***" from her estimates;

l.    CW 3 further elaborated that her GLDD superiors knew of the cost overruns "***from day one***," that they represented to her that the projects were "***unsalvageable***" and that she was directed merely to "***stop the bleeding***." CW 3 also recounted that the Whitestone project had "***run out of money***" within two or three months of its commencement and it was known even before that time that something was "***severely wrong***." CW 3 received direction from GLDD executives to "***stop the bleeding***" on the Whitestone project; and

m.    CW 4, a former NASDI Project Manager and Estimator, stated that it was NASDI Controller Lombard's practice to routinely "***move money around***" from one project to another to create a façade that costly projects were profitable. CW 4 also confirmed that "***everyone knew***" about such accounting manipulations, with the practice openly discussed during billing meetings and that the business practices ***troubled her***. With GLDD's major problems being no secret within the Company, CW 4 confirmed CW 3's accounts regarding the deliberate underbidding on projects, as well as the Whitestone project information; and

n.   CW 5, former GLDD Staff Accountant, confirmed the Company's accounting manipulations, stating that there were ***definitely variances*** between the amount that NASDI had billed its customers and the amounts that the Company would actually receive as payment.

**3.   *Fourth Quarter 2012 and First Quarter 2013 False And Misleading Statements***

104.   On March 14, 2013, the Company issued a press release disclosing its financial results for fourth quarter and fiscal year ended December 31, 2012.  In this press release, as discussed above, GLDD disclosed the immediate departure of Defendant Biemeck, the improper recognition of revenue derived from unauthorized change orders, the need for the restatement and a wide-ranging reduction in the Company's financial results for the second and third quarters of 2012.  While Defendants partially disclosed their fraud, they continued to materially mislead investors and failed to disclose the full extent of their misconduct by falsely assuring the market regarding the extent of GLDD's accounting improprieties and the likelihood that the Company will recoup the amounts improperly booked as revenue from unauthorized change orders.

105.   On the following day, GLDD held an investor conference call to discuss its fourth quarter and fiscal year financial results.  Defendants continued to make false and misleading assurances regarding the demolition segment and the initiatives and efforts being taken to ensure a turnaround in the Company's demolition business.  In this regard, Defendant Berger stated "[w]e obviously had meaningful revenue recognition issues at our demolition segment. ***We believe a significant portion will be recognized in the future***.  Our accounting policies and documentation procedures have been reviewed and ***we do not intend to have these compliance issues going forward***."  Defendant Berger further stated that "[t]he demolition remediation segment is a key part of our growth strategy and ***we are committed to having the right personnel and tools in place to effectively grow the segment while maintaining adequate operational and financial controls***."

106.     Similarly, Defendant Steckel stated during the call that the "demolition business was negatively impacted by pending change orders at projects where our accounting policy did not allow revenue to be recognized. ***We expect much of this revenue to be recognized in future periods***."

107.     On March 29, 2013, GLDD filed its Form 10-K for the fourth quarter of fiscal 2012 for the period ending December 31, 2012, and stated the following financial results:

**Year Ended December 31, 2012 Compared to Year Ended December 31, 2013**

The demolition segment recorded revenues in 2012 of $100.7 million, a decrease of $6.5 million, or 6.1%, from 2011 revenues of $107.2 million. ***Lower revenue levels in 2012 were driven by decreases in bridge demolition work, partially offset by a greater number of site development projects in New York and New England,*** and a project to assist in debris clean-up in New York City after Superstorm Sandy.

* * *

Demolition segment gross profit decreased $20.2 million to a loss of $9.9 million from a profit of $10.3 million in 2011 and demolition segment negative gross profit margin was 9.8%, down from a gross profit margin of 9.6% in 2011. ***A significant drop in gross profit margin was related to work on projects where costs were recognized immediately but the recognition of revenue was deferred due to pending change orders.*** Lower gross profit margins on a higher volume of site development projects, net losses in our abatement projects and $1.3 million of higher operating overhead also contributed to the decrease.

108.     On May 7, 2013 the Company issued a press release disclosing its first quarter 2013 financial results for the quarter ended March 31, 2013, wherein Defendant Steckel stated that the Company "***continue[s] to focus on improving execution and internal controls to deliver better results***."     Defendant Berger stated that "[w]e ***see numerous demolition and environmental remediation opportunities on the horizon***, and ***we will be measured in our approach and selectively target those projects we believe that we can execute well***."

109.    Also on May 7, 2013, the Company held an investor conference call to discuss its 2013 first quarter financial results.    Defendants' continued to make false and misleading assurances regarding the demolition segment and its results along with statements that fraudulently omitted material information regarding the Defendants' fraudulent project costs and demolition segment revenues.  Defendant Berger stated that the "***opportunity to the business are out there***. ***We see better bidding opportunities***."   Defendant Steckel added during an analyst exchange that "***we said we believe we could collect a substantial portion of that. And I think that's where we are at this point***."

110.    The above statements were false and misleading because the Company was not "improving controls" in the demolition segment, did not have the "tools in place" in its demolition division to grow the segment, and could not have reasonably "expected" to recognize "much" of this revenue from pending changing orders in future periods.  In fact, the Company had yet again encountered cost overruns on a new project (not related to the two problematic New York projects) which were attributed to yet another instance of a missed project estimate. Additionally, at the end of the Class Period, the Company disclosed that certain pending change orders for one demolition project no longer qualified for revenue recognition, according to the Company's accounting policy, and as a result reversed revenue of $5.6 million that was previously recognized for the project.

111.    Moreover, the Company's statements concerning its lower revenue figures was not from "decreases in the amount of bridge demolition work" but rather bridge work projects that were underbid leading to the improper recognition of unapproved change orders as revenue in the second and third quarters financials, and the resulting restatement.   Additionally, the Defendants misled investors by stating that the revenue recognition was "deferred" when in fact

there was no reasonable basis to believe such revenue was due or forthcoming, and in fact additional improperly recognized revenue would need to be unrecognized in 2013.

### 4. *False And Misleading Certifications and Disclosure Representations*

112.    In addition to reporting false and misleading operating and financial results in the Company's press releases and quarterly SEC filings throughout the Class Period, GLDD stated that it believed its disclosures were adequate and made the information provided not misleading as set forth below:

> Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") have been condensed or omitted pursuant to the SEC's rules and regulations, ***although management believes that the disclosures are adequate and make the information presented not misleading. In the opinion of management, all adjustments***, which are of a normal and recurring nature (except as otherwise noted), ***that are necessary to present fairly the Company's financial position as of June 30, 2012 [September 30, 2012]***, and its results of operations for the three and six [nine] months ended June 30, 2012 [September 30, 2012] and 2011 and cash flows for the six [nine] months ended June 30, 2012 [September 30, 2012] and 2011 ***have been included***.[9]

113.    Similarly, in the 2012 Second Quarter Form 10-Q, Defendants Berger and Biemeck, and in the 2012 Third Quarter Form 10-Q Defendants Berger and Steckel, each falsely certified that the Company's financial statements were accurate and fairly presented the Company's financial condition, certifying in pertinent part:

> 1. I have reviewed this…report…;

> 2. Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

---

[9] This statement was made in substantially identical form in both the 2012 Quarter 2 Form 10-Q at 8 and 2012 Quarter 3 Form 10-Q at 8.

3. Based on my knowledge, *the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report*;[10]

114.    Additionally, Defendants Berger and Biemeck in the 2012 Second Quarter Form 10-Q, and Defendants Berger and Steckel in the 2012 Third Quarter Form 10-Q, falsely certified the following:

In connection with the…Report…I…certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, as amended; and

(2) *The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company*.[11]

115.    Defendants' representations and certifications with regards to the fair presentation and disclosure of the Company's financial results were materially false and misleading because:

a.    The Company failed to properly account for cost overruns under the percentage-of-completion method under GAAP and, contrary to its representations regarding its accounting practices, thereby inappropriately failed to recognize losses and gave the impression that the Company was financially performing better than it truly was;

b.    GLDD's expansion into the New York area, specifically in bridge demolition, had not actually experienced that amount of revenue increase because the claimed revenue was based on a fraudulent accounting modification that included improper revenue recognition from unapproved change orders;

c.    The Company failed to disclose that the growth in revenue of 6% from the prior year, and increased contribution to the company of 20% over the 12% three year average was attributed to this accounting modification in the New York projects that falsely inflated revenue.    Without this disclosure, the Company's information was false and misleading because

---

[10] 2012 Quarter 1 Form 10-Q's Exhibit 31.1 and Exhibit 31.2; 2012 Quarter 2 Form 10-Q's Exhibit 31.1 and Exhibit 31.2.

[11] 2012 Quarter 1 Form 10-Q's Exhibit 32.1 and Exhibit 32.2; 2012 Quarter 2 Form 10-Q's Exhibit 32.1 and Exhibit 32.2.

it established that the demolition segment's operating and financial success was due to the new management's focus on large projects with higher profit margins, when in fact it was continuing to lose money on the same projects in the New York;

d.     The Company was experiencing known, but undisclosed, material losses on projects in the New York region, which were having a material adverse effect on GLDD's revenues and operating income, particularly as in relation to the Company's NASDI demolition division.  For instance, CW 1, Former Vice President of Operations for NASDI who was responsible for overseeing the Company's New York demolition projects, confirmed that the projects were underperforming and experienced significant cost overruns from the onset, and that GLDD and NASDI executives were "***well aware***" and were "***concerned***" about the costs incurred on the New York projects;

e.     As a result of the ***actual*** poor performance of these projects in the demolition segment, the Company improperly recognized millions of dollars of revenue from change orders, all the while knowing that the collection of those change orders was contractually problematic and unlikely, and while knowing that there was no way to accurately estimate what amount, if any, could ultimately be collected under any circumstances;

f.     The Company failed to properly account for cost overruns under the percentage-of-completion method under GAAP (as explained below in Section VII) and contrary to its representations regarding its accounting practices, thereby inappropriately failing to recognize losses and providing investors with the impression that the Company was performing financially better than it truly was;

g.     The Company was engaging in improper accounting of its accounts receivable as a result of recording revenue from pending change orders where client acceptance had not been finalized and therefore was overstating its demolition segment revenues as a result;

h.     The Company was overstating its accounts receivable and therefore its demolition segment revenues as a result of Defendants' improperly reducing the Company's allowance for doubtful accounts during the Class Period contrary to GAAP;

i.     The Company was overstating the goodwill in the demolition segment, and notwithstanding the declining earnings and obvious changes in business conditions (as discussed above), Defendants continued to misrepresent the value of the goodwill in the Company's demolition segment by approximately $21.5 million in direct contravention of GAAP and the Company's stated accounting practices;

j.     Defendants failed to disclose known trends and uncertainties in violation of SEC regulations as a result of improperly recognizing revenue from change orders during the Class Period, thus providing the impression that the demolition segment was growing and performing substantially better than what it actually was;

k.     The reports of former employees of the Company's NASDI division also confirm the Company's false financial results and that well before the Class Period that GLDD's demolition division routinely was not paid for reimbursements from change orders. For instance, CW 3, a former VP of Operations for NASDI, who was tasked with providing regular updates of the status of the New York projects, stated that the Company attempted to rectify cost overruns with "***change orders***" but "***good luck***" if the Company actually received reimbursement;

l.     CW 1, CW 2, CW 3 and CW 4 corroborated the fact that several New York projects, including the Whitestone and St. George Ferry projects, were severely and intentionally underbid, and that they were immediate financial disappointment. CW 2, the former Business Development Estimator at NASDI, confirmed the Company's bidding practices to the extent that demolition executives submitted bids that did not reflect CW 2's estimate, which took into account the unique nature of New York's labor rates when providing estimates for New York projects. However, as the former employees attest, the projects were ultimately bid at under-budget levels and, as CW 2 stated, were a "***different story***" from her estimates;

m.     CW 3 further elaborated that her GLDD superiors knew of the cost overruns "***from day one***," that they represented to her that the projects were "***unsalvageable***" and that she was directed merely to "***stop the bleeding***." CW 3 also recounted that the Whitestone project had "***run out of money***" within two or three months of its commencement and it was known even before that time that something was "***severely wrong***." CW 3 received direction from GLDD executives to "***stop the bleeding***" on the Whitestone project; and

n.     CW 4, a former NASDI Project Manager and Estimator, stated that it was NASDI Controller Lombard's practice to routinely "***move money around***" from one project to another to create a façade that costly projects were profitable. CW 4 also confirmed that "***everyone knew***" about such accounting manipulations, with the practice openly discussed during billing meetings and that the business practices ***troubled her***. With GLDD's major problems being no secret within the Company, CW 4 confirmed CW 3's accounts regarding the deliberate underbidding on projects, as well as the Whitestone project information; and

58

o.     CW 5, former GLDD Staff Accountant, confirmed the Company's accounting manipulations, stating that there were **definitely variances** between the amount that NASDI had billed its customers and the amounts that the Company would actually receive as payment.

**B.     FALSE STATEMENTS REGARDING GLDD'S ACCOUNTING PRACTICES**

116.    In addition to reporting false and misleading financial and operating results, and as described more fully in Section VII below, GLDD's quarterly SEC filings throughout the Class Period falsely stated that its financial reporting complied with GAAP:

Critical Accounting Policies and Estimates

In preparing its consolidated financial statements, **the Company follows accounting principles generally accepted in the United States of America**. The application of these principles requires significant judgments or an estimation process that can affect the results of operations, financial position and cash flows of the Company, as well as the related footnote disclosures. The Company continually reviews its accounting policies and financial information disclosures. **There have been no material changes in the Company's critical accounting policies or estimates since December 31, 2011.**

117.    Throughout the Class Period, the Company stated in its quarterly SEC filings that it accounted for contract backlog costs and revenue in the demolition segment in the following manner:

The Company's contract backlog represents its estimate of the revenues that will be realized under the portion of the contracts remaining to be performed. …**For demolition contracts, these estimates are based on the time and remaining costs required to complete the project, relative to total estimated project costs and project revenues agreed to with the customer.**

\* \* \*

A large portion of the backlog earned in…2012 relates to the **new management's focus on large complex projects such as municipal developments in New York** and specialty work such as **bridge demolition** in Louisiana, New Hampshire and New York.

118.    Specifically, the 2012 Second Quarter Form 10-Q stated the following:

**Accounts receivable and contracts in progress**

Accounts receivable at June 30, 2012 and December 31, 2011 are as follows:

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| Completed contracts | $ 30,713 | $ 38,317 |
| Contracts in progress | 71,506 | 69,469 |
| Retainage | 21,220 | 20,692 |
| | 123,439 | 128,478 |
| Allowance for doubtful accounts | (1,500) | (1,839) |
| Total accounts receivable—net | $121,939 | $126,639 |
| Current portion of accounts receivable—net | $112,897 | $120,268 |
| Long-term accounts receivable and retainage | 9,042 | 6,371 |
| Total accounts receivable—net | $121,939 | $126,639 |

The components of contracts in progress at June 30, 2012 and December 31, 2011 are as follows:

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| Costs and earnings in excess of billings: | | |
| Costs and earnings for contracts in progress | $ 366,985 | $ 173,187 |
| Amounts billed | (317,477) | (152,045) |
| Costs and earnings in excess of billings for contracts in progress | 49,508 | 21,142 |
| Costs and earnings in excess of billings for completed contracts | 1,381 | 7,459 |
| Total contract revenues in excess of billings | $ 50,889 | $ 28,601 |
| Current portion of contract revenues in excess of billings | $ 50,889 | $ 26,412 |
| Portion included in other noncurrent assets | — | 2,189 |
| Total contract revenues in excess of billings | $ 50,889 | $ 28,601 |
| Billings in excess of costs and earnings: | | |
| Amounts billed | $(383,047) | $(427,797) |
| Costs and earnings for contracts in progress | 363,048 | 414,170 |
| Total billings in excess of contract revenues | $ (19,999) | $ (13,627) |

119.    Similarly, the 2012 Third Quarter Form 10-Q stated the following:

**Accounts receivable and contracts in progress**

Accounts receivable at September 30, 2012 and December 31, 2011 are as follows:

| | September 30, 2012 | December 31, 2011 |
|---|---|---|
| Completed contracts | $ 27,119 | $ 38,317 |
| Contracts in progress | 94,671 | 69,469 |
| Retainage | 21,788 | 20,692 |
| | 143,578 | 128,478 |
| Allowance for doubtful accounts | (750) | (1,839) |
| Total accounts receivable—net | $142,828 | $126,639 |
| Current portion of accounts receivable—net | $134,244 | $120,268 |
| Long-term accounts receivable and retainage | 8,584 | 6,371 |

| | | |
|---|---|---|
| Total accounts receivable—net | $142,828 | $126,639 |

The components of contracts in progress at September 30, 2012 and December 31, 2011 are as follows:

| | September 30, 2012 | December 31, 2011 |
|---|---|---|
| Costs and earnings in excess of billings: | | |
| Costs and earnings for contracts in progress | $ 333,058 | $ 173,187 |
| Amounts billed | (274,273) | (152,045) |
| Costs and earnings in excess of billings for contracts in progress | 58,785 | 21,142 |
| Costs and earnings in excess of billings for completed contracts | 3,361 | 7,459 |
| Total contract revenues in excess of billings | $ 62,146 | $ 28,601 |
| Current portion of contract revenues in excess of billings | $ 62,146 | $ 26,412 |
| Portion included in other noncurrent assets | — | 2,189 |
| Total contract revenues in excess of billings | $ 62,146 | $ 28,601 |
| Billings in excess of costs and earnings: | | |
| Amounts billed | $(451,568) | $(427,797) |
| Costs and earnings for contracts in progress | 430,751 | 414,170 |
| Total billings in excess of contract revenues | $ (20,817) | $ (13,627) |

120.    GLDD's failure to properly account for and disclose the Company's uncollectible accounts receivables was materially misleading to investors.  For the quarters ended June 30, 2012 and September 30, 2012, GLDD failed to properly account for unapproved change orders, overstating its accounts receivable.  The Company's accounts receivables were overstated at June 30, 2012 and September 30, 2012, by approximately $1.7 million and $6.9 million, respectively, as a result of improperly recording revenues on unapproved change orders from contracts in its demolition segment.  Additionally, as described below in Section VII, Defendants violated GAAP and SEC rules by failing to record adequate provisions for uncollectible receivables in its financial statements related to its uncollectible accounts.

### C.  FALSE STATEMENTS REGARDING GOODWILL

121.    Defendants also made false and misleading statements concerning the Company's Goodwill throughout the Class Period.   For instance, in the Company's Form 10-Q for the Second Quarter of 2012, GLDD represented the following:

> The Company operates in two reportable segments: dredging and demolition. These reportable segments are the Company's operating segments and the reporting units at which the Company tests goodwill for impairment. **The Company performed its most recent annual test of impairment as of July 1, 2011 for the goodwill in both the dredging and demolition segments with no indication of goodwill impairment as of the test date**. As of the test date, the fair value of both the dredging segment and the demolition segment were in excess of their carrying values by approximately 35% and 8%, respectively. **Given the small margin with which the demolition segment's fair value is in excess of its carrying value, a more than insignificant decline in the demolition segment's future operating results or cash flow forecasts versus the segment's current forecasts could potentially cause a goodwill impairment charge to be recognized in a future period**. The Company will perform its next scheduled annual test of goodwill in the third quarter of 2012.

122.    The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that the demolition segment had suffered a triggering event as a result of the undisclosed contract losses on the Company's troubled New York projects, including the Whitestone and St. George Ferry projects, resulting in a decline in the overall financial performance and expected future cash flows of the demolition segment.

123.    In the Company's Form 10-Q for the Third Quarter of 2012, GLDD represented the following:

> The Company operates in two reportable segments: dredging and demolition. These reportable segments are the Company's operating segments and the reporting units at which the Company tests goodwill for impairment. **The Company performed its most recent annual test of impairment as of July 1, 2012 for the goodwill in both the dredging and demolition segments with no indication of goodwill impairment as of the test date.** The Company will perform its next scheduled annual test of goodwill in the third quarter of 2013.

124.    The foregoing statements were materially false and misleading when made because Defendants knew or recklessly disregarded that GLDD's demolition segment had suffered a decline in the overall financial performance and expected future cash flows, and thus there was a triggering event that required the Company to accelerate the impairment test and record a charge in the Second Quarter of 2012.

125.    In the Company's Form 10-K for 2012, GLDD disclosed the following related to goodwill:

> Impairment of goodwill —Goodwill is tested for impairment at the reporting unit level on an annual basis and between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of the reporting unit below its carrying value. The Company believes that this estimate is a critical accounting estimate because: (i) goodwill is a material asset and (ii) the impact of an impairment could be material to the consolidated balance sheet and consolidated statement of operations. The Company performs its annual impairment test as of July 1 each year. The Company operates in two reportable segments: dredging and demolition. Four operating segments were aggregated into two reportable segments as the segments have similarity in economic margins, services, production processes, customer types, distribution methods and regulatory environment. The Company has determined that the operating segments are the Company's four reporting units. Prior to the re-evaluation of segments at year end, the Company had two reportable segments that were the operating segments and the reporting units.
>
> The Company assesses the fair values of its reporting units using both a market-based approach and an income-based approach. ***Under the income approach, the fair value of the reporting unit is based on the present value of estimated future cash flows. The income approach is dependent on a number of factors, including estimates of future market growth trends, forecasted revenues and expenses based upon historical operating data, appropriate discount rates and other variables***. The estimates are based on assumptions that the Company believes to be reasonable, but such assumptions are subject to unpredictability and uncertainty. Changes in these estimates and assumptions could materially affect the determination of fair value, and may result in the impairment of goodwill in the event that actual results differ from those estimates.
>
> The market approach measures the value of a reporting unit through comparison to comparable companies. Under the market approach, the Company uses the guideline public company method by applying estimated market-based enterprise value multiples to the reporting unit's estimated revenue and Adjusted EBITDA. The Company analyzed companies that performed similar services or are

considered peers. Due to the fact that there are no public companies that are direct competitors, the Company weighed the results of this approach less than the income approach.

At both December 31, 2012 and 2011, the dredging segment's goodwill was $76.6 million. **At December 31, 2012 and 2011, the demolition segment's goodwill was $24.2 million and $21.5 million, respectively**.

**The Company performed its most recent annual test of impairment as of July 1, 2012 for the goodwill in both the dredging and demolition segments with no indication of goodwill impairment as of the test date. As of the test date, the fair value of both the dredging segment and the demolition segment were in excess of their carrying values by at least 35%.** The Company will perform its next scheduled annual test of goodwill in the third quarter of 2013 should no triggering events occur which would require a test prior to the next annual test. **No goodwill impairment test was performed in the fourth quarter of 2012 for either segment because no triggering event occurred which would require such a test.**

126.    The statements above were materially false and misleading when made because Defendants knew or recklessly disregarded that the Company was experiencing known, but undisclosed, material losses on projects in the New York region, which were having a material adverse effect on GLDD's revenues and operating income, particularly as in relation to the Company's demolition segment.

127.    In the Company's First Quarter 2013 Form 10-Q, Defendants omitted many of the disclosures discussing goodwill contained in the previously-filed Forms 10-Q during the Class Period.  Moreover, Defendants removed all discussions concerning impairment that were contained in the Company's previously filed 10-Qs during the Class Period.

### D.    FALSE STATEMENTS REGARDING INTERNAL CONTROLS

128.    Throughout the Class Period, GLDD and the Individual Defendants regularly made statements concerning the purported effectiveness and adequacy of the Company's internal financial controls as defined in Rule 13a-15(f) or 15d-15(f) promulgated under the Exchange Act.

129.    For instance, in the Company's 2012 Second Quarter Form 10-Q, Defendants Berger and Biemeck, and in the Company's 2012 Third Quarter Form 10-Q, Defendants Berger and Steckel, stated the following in almost identical form:

*a) Evaluation of disclosure controls and procedures*

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures, as required by Rule 13a-15(b) and 15d-15(b) under the Securities Exchange Act of 1934 (the "Exchange Act") as of September 30, 2012. *Our disclosure controls and procedures are designed to reasonably assure that information required to be disclosed by us in reports we file or submit under the Exchange Act is accumulated and communicated to our management*, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding disclosure and is recorded, processed, summarized *and reported within the time periods specified in the Securities and Exchange Commission's rules and forms.*

*Our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective in providing such reasonable assurance*.

*b) Changes in internal control over financial reporting.*

There *have been no changes* in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) during the fiscal quarter ended September 30, 2012 *that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting*.

130.    In the Company's 2012 Second Quarter Form 10-Q Defendants Berger and Biemeck, and in the Company's 2012 Third Quarter Form 10-Q Defendants Berger and Steckel, signed the Section 302 certification, which states the following regarding GLDD's internal controls:

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our

supervision, *to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared*;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, *to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;

(c)     *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions* about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such an evaluation; and

(d)     *Disclosed in this report any change in the registrant's internal control over financial reporting* that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) *that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;* and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a)     *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting* which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting*.

131.     GLDD's representations and the certifications signed by Defendants Berger, Biemeck and Steckel concerning the adequacy of the Company's disclosure controls and procedures were false and misleading because GLDD's financial reporting and internal controls were suffering from significant deficiencies and materially weaknesses, thus rendering the

Company unable to accurately report material information. The disclosure controls were significantly deficient because Defendants failed to disclose that the Company was experiencing known material losses on projects in the New York region, that GLDD knew it was likely to suffer significantly more losses on the troubled New York projects, and that the Company was continuing to record millions of dollars of unapproved change orders as revenue and manipulating the accounting on existing projects in a manner that would make GLDD appear more financially sound that it truly was, all of which were facts that had a material impact on the Company's financial reporting.

132.     In addition, the Individual Defendants' certifications were false and misleading in that the Company suffered from significant and known deficiencies in its internal controls because GLDD lacked the proper procedures for adequate monitoring of financial performance and reporting over its business operations. GLDD failed to disclose that the Company did not have in place adequate internal contract performance monitoring, cost and financial controls, and accounting systems and protocols that would accurately reflect contract completion, the actual costs being incurred and payments due, or the current level or forecasted performance on large contracts.

133.     Moreover, GLDD admitted March 14, 2013 that it was forced to restate financial results for the Second and Third Quarters of 2012, and that the Company suffered from "a material weakness in its internal control over financial reporting" during the Class Period. The reports of former GLDD executives also establish that the Company suffered from substantially compromised internal controls, which, as described above in Sections IV(B)-(C), were known to the Company's executives, including the Individual Defendants.

134.   Accordingly, Defendants' statements during the Class Period that GLDD had in place effective internal controls over financial reporting was patently false and materially misleading when made.   On the contrary, as discussed above, the Company suffered from material deficiencies in its internal controls, which allowed Defendants' fraudulent accounting scheme to occur in the first place and continue unabated for years.

## VII.   RELEVANT GAAP AND ACCOUNTING PROVISIONS

### A.   OVERVIEW OF GAAP

135.   During the Class Period, Defendants represented that GLDD's financial statements were prepared in conformity with GAAP, which are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time.   However, in order to artificially inflate the price of GLDD's common stock, Defendants used improper accounting practices in violation of GAAP and SEC reporting requirements to falsely inflate the Company's revenues, earnings, assets, and stockholders' equity during the Class Period.

136.   GLDD's materially false and misleading financial statements resulted from a series of deliberate senior management decisions designed to conceal the truth regarding GLDD's actual financial position and operating results.   Defendants caused the Company to violate GAAP and SEC rules by, among other things:

a.      Improperly overstating the Company's revenues and gross profit;

b.      Improperly overstating the Company's accounts receivables;

c.      Improperly overstating the Company's goodwill.

137.   As set forth in Financial Accounting Standards Board ("FASB") Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting

is to provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

138.     Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.

139.     SEC Rule 4-01(a) of SEC Regulation S-X provides that: "Financial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1). Management is responsible for preparing financial statements that conform to GAAP. As stated in the professional standards adopted by the AICPA:

> [F]inancial statements are management's responsibility . . . . [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management . . . . Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

**B.     DEFENDANTS' IMPROPER REVENUE RECOGNITION**

140.     Defendants violated GAAP and SEC regulations by engaging in improper revenue recognition practices. Specifically, as a result of recording revenue from unapproved change orders and the unlikely collectibility of resulting receivables from these contracts, this revenue

was not reasonably assured. In improperly recognizing these funds, Defendants overstated GLDD revenues, gross profit and earnings during the Class Period.

141. GAAP permits the recognition of revenue only if the following criteria are met: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred; (iii) the vendor's fee is fixed or determinable; and (iv) collectibility is probable. SEC Staff Accounting Bulletin ("SAB") No. 104. Moreover, in order for revenue to be recognized, it must be earned and realized or realizable. Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶ 83, ASC 605-10-25-1(a).[12] Revenues are earned when the reporting entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues. *Id*. Revenues are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash. *Id*. If collectibility is not reasonably assured, revenues should be recognized on the basis of cash received. Concepts Statement No. 5, ¶ 84g; *see also Accounting Research Bulletin* No. 43 ("ARB 43"), Ch. 1A, ¶ 1 (June 1943); ASC 605-10-25-1; Accounting Principles Board Opinion No. 10 ("APB 10") *Omnibus Opinion-1966* ¶ 12 (Dec. 1966). If payment is subject to a significant contingency, revenue recognition is improper. Statement of Financial Accounting Standards ("SFAS") No. 5, *Accounting for Contingencies* (Mar. 1975); ASC 450-30-25-1.

---

[12] With the issuance of FASB Statement No. 168, *The FASB Accounting Standards CodificationTM and the Hierarchy of Generally Accepted Accounting Principles*, the FASB approved the Codification ("ASC") as the source of authoritative US GAAP for non-governmental entities for interim and annual periods ending after September 15, 2009. The *FASB Accounting Standards Codification*, hereinafter cited as "ASC __."

142.     Defendants represented that the Company's accounting for revenue recognition was consistent with GAAP.  For example, in the Company's 2011 Form 10-K filed with the SEC on March 9, 2012,[13] Defendants represented the following:

> The Company recognizes contract revenues under the percentage-of-completion method, based on the Company's engineering estimates of the physical percentage completed for dredging projects and using a cost-to-cost approach for demolition projects. . . .  For demolition projects, contract revenues are adjusted to reflect the estimated gross profit percentage. Provisions for estimated losses on contracts in progress are made in the period in which such losses are determined. **_Claims for additional compensation due to the Company are not recognized in contract revenues until such claims are settled._** Billings on contracts are generally submitted after verification with the customers of physical progress and may not match the timing of revenue recognition. The difference between amounts billed and recognized as revenue is reflected in the balance sheet as either contract revenues in excess of billings or billings in excess of contract revenues. Contract modifications may be negotiated when a change from the original contract specifications is encountered, necessitating a change in project scope or performance methodology and/or material disposal. Significant expenditures incurred incidental to major contracts are deferred and recognized as costs of contracts based on contract performance over the duration of the related project. These expenditures are reported as prepaid expenses.

143.     ASC 605-35-25-25 *Construction-Type and Production -Type Contracts*, describes change orders as "modifications of an original contract that effectively change the provisions of the contract without adding new provisions."  According to ASC 605-35-25-27, contact revenues and costs shall only "be adjusted to reflect change orders approved by the customer and the contractor regarding both scope and price.

144.     The Company also represented in its Form 10-K filed with the SEC on March 9, 2012 that "[c]laims for additional compensation due to the Company are not recognized in contract revenues until such claims are settled."

---

[13] Defendants specifically told investors that the Company's Forms 10-Q filed during the Class Period "[should be read in conjunction with the audited consolidated financial statements . . . and the notes thereto, included in the Company's Annual Report on Form 10-K for the year ended December 31, 2011."

145.    ASC 605-35 also sets forth the conditions which must exist for contractors to recognize income for amounts the contractor seeks to collect which are not included in the contract.   Where a contractor seeks to recover unapproved claims it may record them or recognize them as revenue only where collection is objectively probable.   ASC 605-35-25-30 states:

> Claims are amounts in excess of the agreed contract price (or amounts not included in the original contract price) that a contractor seeks to collect from customers or others for customer-caused delays, errors in specifications and - designs, contract terminations, change orders in dispute or unapproved as to both scope and price, or other causes of unanticipated additional costs.

146.    ASC 605-35-25-31 states:

> Recognition of amounts of additional contract revenue relating to claims is appropriate only if it is probable that the claim will result in additional contract revenue and if the amount can be reliably estimated . Those two requirements are satisfied by the existence of all the following conditions:
>
> a.    The contract or other evidence provides a legal basis for the claim; or a legal opinion has been obtained, stating that under the circumstances there is a reasonable basis to support the claim.
>
> b.    Additional costs are caused by circumstances that were unforeseen at the contract date and are not the result of deficiencies in the contractor's performance.
>
> c.    Costs associated with the claim are identifiable or otherwise determinable and are more reasonable in view of the work performed.
>
> d.    The evidence supporting the claim is objective and verifiable, not based on management's feel for the situation or on unsupported representations.

147.    In contradiction to GAAP and the Company's own disclosed policies, however, GLDD improperly recognized revenue on pending change orders where client acceptance had not been finalized, and thus persuasive evidence of an arrangement did not exist, overstating

demolition segment revenues by $3.9 million and $4.3 million during the 2012 2nd and 3rd quarters, respectively.

C.  DEFENDANTS' FAILURE TO PROPERLY ACCOUNT FOR COST OVERRUNS

148.  GLDD accounted for its long-term construction contracts under the percentage-of-completion method, which requires that project losses be recognized when estimates or other information available indicate a contract will result in a loss.  GLDD's failure to do so was contrary to the percentage-of-completion income-recognition method as prescribed by GAAP and contrary to what the Company represented it did in describing its own accounting policies.  For example, the Company disclosed in its 2012 10-K filed with the SEC that "[p]rovisions for estimated losses on contracts in progress are made in the period in which such losses are determined."

149.  ASC 605-35 describes the computation of earnings based on the use of percentage-of-completion accounting.  An important element of ASC 605-35 involves a situation, such as that experienced by GLDD, where, after a contract is commenced, current estimates of the costs to complete the contract indicate that the contract as a whole will generate a loss.  ASC 605-35-25-46 states:

> When the current estimates of total contract revenue and contract cost indicate a loss, a provision for the entire loss on the contract shall be made. Provisions for losses shall be made in the period in which they become evident under either the percentage-of-completion method or the completed-contract method.

150.  According to CW 3, both the Whitestone and St. George Ferry projects had been experiencing significant cost overruns during her tenure because the projects had been significantly underbid by the Company.  CW 3 stated that GLDD had bid the Whitestone project at approximately $5 million, but had incurred approximately $13 million but had incurred approximately $13 million in costs, thereby resulting in an approximate $7.7 million loss.  CW 3

described the extensive reports and additional protocol that she undertook to notify NASDI and GLDD executives that the New York projects were operating at significant losses. CW 4 understood that the projects had been intentionally underbid.

151. CW 3 explained that the key reason why the projects had experienced such significant losses was because the Company had severely underbid the projects to secure a foothold in the New York market, as well as the fact that Company officials did not fully understand the requirements of the New York labor market prior to their expansion efforts. CW 3 stated that she realized as soon as she took over the New York market for the Company in approximately February 2012 that the projects were over-budget and severely underbid. Furthermore, it was clear to CW 3 that these projects had been impacted by costs that would exceed what the Company bid for the project "from day one."

152. Defendants thus knew or recklessly disregarded that the Company's demolition division underbid these projects, resulting in significant losses from their inception. Accordingly, Defendants violated GAAP by failing to immediately recognize losses related to these obviously troubled projects.

### D. DEFENDANTS' IMPROPER ACCOUNTING OF ACCOUNTS RECEIVABLE

153. GLDD's reported financial results during the Class Period were materially false and misleading because the Company overstated its accounts receivables as a result of recording revenue from unapproved change orders where client acceptance had not been finalized. GLDD's accounts receivables were also overstated as a result of Defendants improperly reducing the allowance for doubtful accounts.

154. Defendants represented in the Company's 2011 Form 10-K filed with the SEC on March 9, 2012, in pertinent part, the following:

> Accounts Receivable, net—Accounts receivable represent amounts due or billable under the terms of contracts with customers, including amounts related to retainage. . . . The Company provides an allowance for estimated uncollectible accounts receivable when events or conditions indicate that amounts outstanding are not recoverable.

155.     In addition, Accounting Research Bulletin ("ARB") No. 43, Chapter 3, Section 9 provides that the objective of providing for reserves against receivables is to assure that, "[a]ccounts receivable net of allowances for uncollectible accounts . . . are effectively stated as the amount of cash estimated as realizable."

156.     Contrary to GAAP, however, GLDD carried on its books the accounts receivable related to troubled demolition projects in New York without any offsetting reserve, even though the amounts were unapproved and thus uncollectible.   Defendants also improperly reduced the allowance for doubtful accounts during the 2nd and 3rd quarters of 2012.

157.     GLDD maintained an allowance for doubtful accounts, which the Company disclosed in its SEC filings.  *See* 2012 Second Quarter Form 10-Q at 9; 2012 Third Quarter Form 10-Q at 9.  Defendants, however, failed to properly disclose material changes in estimates for its allowance for doubtful accounts reserve when it lowered such reserve by over $1 million over the course of two consecutive quarters.[14]   In this regard, GLDD reduced its allowance for doubtful accounts from approximately 1.4% at December 31, 2012 down to 1.2% at June 30, 2012 and then 0.5% at September 30, 2012.  For example:

---

[14] The Company made no adjustment to the allowance for doubtful accounts during the First Quarter 2012.

| | Dec. 31, 2011 | June 30, 2012 | Sept. 30, 2012 |
|---|---|---|---|
| Completed contracts | $38,317 | $30,713 | $27,119 |
| Contracts in progress | 69,469 | 71,506 | 94,671 |
| Retainage | 20,692 | 21,220 | 21,788 |
| | 128,478 | 123,439 | 143,578 |
| Allowance for doubtful accounts | 1,839 | 1,500 | 750 |
| | | | |
| **Total accounts receivable net** | **$126,639** | **$121,939** | **$142,828** |
| | | | |
| Allowance as a % total accounts receivable | 1.4% | 1.2% | 0.5% |

158.    This resulted in GLDD reducing its allowance account and thereby increasing its pre-tax income by $339,000 and $750,000 for the quarters-ended June 30, 2012 and September 30, 2012.  These reductions were material to GLDD's pre-tax income in each period.

159.    The Company's failure to properly account for and disclose GLDD's uncollectible accounts receivables was materially misleading to investors.  For the quarters ended June 30, 2012 and September 30, 2012, GLDD failed to properly account for unapproved change orders, overstating its accounts receivable.  The Company's accounts receivables were overstated at June 30, 2012 and September 30, 2012, by approximately $1.7 million and $6.9 million, as a result of improperly recording revenues on unapproved change orders from contracts in its demolition segment.  Additionally, Defendants violated GAAP and SEC rules by failing to record adequate provisions for uncollectible receivables in its financial statements related to its uncollectible accounts.

E.  **DEFENDANTS' IMPROPER ACCOUNTING FOR GOODWILL**

160.  In connection with GLDD's acquisition of NASDI, GLDD recorded "goodwill" on the Company's balance sheet of approximately $30 billion.  In regards to the acquisition, GLDD disclosed on April 17, 2001 via an 8-K the following:

> [The Company] plans to acquire 80% of the common stock of North American Site Developers, Inc., one of the three largest U.S. providers of commercial and industrial demolition ("CID") services. NASDI is headquartered in Allston, Massachusetts and operates primarily in New England. NASDI offers a comprehensive array of demolition-related services including: interior and exterior demolition; salvage, recycling and disposal of related materials; and site preparation. Total purchase consideration for the acquisition is expected to be approximately $38.0 million. The transaction is subject to customary closing conditions.

> "The acquisition of NASDI is expected to enhance the growth of our revenues and cash flows as well as provide diversification in our customer base to non-governmental entities," commented Douglas B. Mackie, President and Chief Executive Officer of Great Lakes. "Similar to our dredging activities, NASDI's CID activities include the removal, transportation, and disposal of materials using specialized equipment, employing a unionized workforce, exercising a disciplined bidding process and requiring special operating permits, licenses and skills. By integrating and supplementing certain of NASDI's administrative functions, we can better enable NASDI management to focus on exploiting new business opportunities."

161.  Goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination.  Companies account for their business combinations using the purchase method of accounting, as set forth in ASC 805, *Business Combinations*.  The assigned amounts may be adjusted for a period of up to one year after the date of the acquisition if new information becomes available as to the actual fair value amounts of the assets or liabilities as of the date of the acquisition.  The excess of the purchase price over the fair value of the net assets acquired is recognized as an asset called goodwill.  ASC 805-30-30-1.

162.  Thereafter, companies are required to account for their goodwill in accordance with ASC 350, *Intangibles - Goodwill and Other*.  According to ASC 350-20-35-3, an entity may

77

first assess qualitative factors, to determine whether it is necessary to perform a two-step goodwill impairment test.[15]  If determined to be necessary, the two-step impairment test shall be used to identify potential goodwill impairment and measure the amount of a goodwill impairment loss to be recognized (if any).

163.    ASC 350-20-35-3C states that in evaluating whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount, an entity shall assess relevant events and circumstances, including but not limited to:

> Cost factors such as increases in  . . . labor, or other costs that have a negative effect on earnings and cash flows;
>
> Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods,
>
> Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation.

164.    To be sure, and as discussed in detail above, GLDD's demolition segment had suffered each of the above issues from at least prior to the Second Quarter of 2012.

165.    As discussed above, testing for goodwill impairment is a two-step process.  The first step compares the fair value of a reporting unit with its carrying amount.  ASC 350-20-35-4. If the carrying value of the reporting unit including goodwill exceeds its fair value, then, in the second step, the amount of impairment (*i.e.*, excess over fair value) is determined.  ASC 350-20-35-8. The fair value of a reporting unit refers to the price that would be received to sell the unit

---

[15] This was a change in the accounting for goodwill, as part of Accounting Standards Update 2011-08 which became effective for annual and interim goodwill impairment tests performed for fiscal years beginning after December 15, 2011.  Early adoption was permitted.  According to GLDD's 2011 10-K, "[i]n 2011, the Company early adopted new accounting guidance that allows for the option to perform a qualitative assessment prior to calculating the fair value of a reporting unit in the first step of the annual goodwill impairment testing. The adoption of this new accounting principle had no impact as the Company chose to perform a quantitative assessment of impairment in the current year."

as a whole in an orderly transaction between market participants at the measurement date. ASC

350-20-35-22. Quoted market prices in active markets are the best evidence of fair value and

shall be used as the basis for the measurement, if available. *Id.*

166. Defendants represented that the Company's accounting for goodwill was

consistent with GAAP. For example, in the Company's 2011 Form 10-K, Defendants

represented the following:

> Goodwill and Other Intangible Assets—Goodwill represents the excess of cost over fair value. Other identifiable intangible assets mainly represent developed technology and databases, customer relationships, and customer contracts acquired in business combinations and are being amortized over a one to ten-year period.

> Goodwill is tested annually for impairment in the third quarter of each year, or more frequently should circumstances dictate. GAAP requires that goodwill of a reporting unit be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount.

> The Company assesses the fair values of its reporting units using both a market-based approach and an income-based approach. *Under the income approach, the fair value of the reporting unit is based on the present value of estimated future cash flows. The income approach is dependent on a number of factors, including estimates of future market growth trends, forecasted revenues and expenses, appropriate discount rates and other variables.* The estimates are based on assumptions that the Company believes to be reasonable, but such assumptions are subject to unpredictability and uncertainty. Changes in these estimates and assumptions could materially affect the determination of fair value, and may result in the impairment of goodwill in the event that actual results differ from those estimates.

> The market approach measures the value of a reporting unit through comparison to comparable companies. Under the market approach, the Company uses the guideline public company method by applying estimated market-based enterprise value multiples to the reporting unit's estimated revenue and Adjusted EBITDA. The Company analyzed companies that performed similar services or are considered peers. Due to the fact that there are no public companies that are direct competitors, the Company weighed the results of this approach less than the income approach.

> The Company operates in two reportable segments: dredging and demolition. These reportable segments are the Company's operating segments and the

reporting units at which the Company tests goodwill for impairment. In 2011, the Company early adopted new accounting guidance that allows for the option to perform a qualitative assessment prior to calculating the fair value of a reporting unit in the first step of the annual goodwill impairment testing. The adoption of this new accounting principle had no impact as the Company chose to perform a quantitative assessment of impairment in the current year.

167.    For purposes of GLDD's goodwill impairment analysis, the $21.5 million of goodwill from the NASDI and Yankee acquisitions was allocated to GLDD's demolition segment. In conducting goodwill testing for the demolition segment, Defendants ignored that the segment was experiencing known, but undisclosed, material losses on projects in the New York region, which were having a material adverse effect on GLDD's revenues and operating income, particularly as in relation to the Company's NASDI demolition segment.

168.    By at least the Second Quarter of 2012 and throughout the Class Period, the financial performance of GLDD's demolition division continued to deteriorate materially. This financial deterioration, albeit undisclosed, clearly indicated that the fair value of the goodwill for the demolition segment was less than its carrying amount, necessitating a charge to income.

169.    GLDD represented that it had conducted a goodwill impairment test as of as of July 1, 2012 for the dredging and demolition segments. For example, the Company's 2012 Third Quarter Form 10-Q stated in pertinent part:

The Company operates in two reportable segments: dredging and demolition. These reportable segments are the Company's operating segments and the reporting units at which the Company tests goodwill for impairment. The Company performed its most recent annual test of impairment as of July 1, 2012 for the goodwill in both the dredging and demolition segments with no indication of goodwill impairment as of the test date. The Company will perform its next scheduled annual test of goodwill in the third quarter of 2013.

170.    From June 30, 2012 through the end of the Class Period, GLDD represented that no indication of goodwill impairment existed, despite the demolition segment's deteriorating financial performance. Indeed, not until the Second Quarter of 2013 did GLDD write-down the

goodwill associated with the demolition segment. In this regard, the Company disclosed in its Second Quarter 2013 earnings release the following:

> [D]ue to a decline in the overall financial performance and declining cash flows in the demolition reporting unit, we concluded there was a triggering event that required us to accelerate the test to the second quarter. We wrote down the value of goodwill related to this reporting unit by $21.5 million, reflecting our best estimate of impairment at this time. We are currently completing our detailed valuation of the demolition segment assets and liabilities, and will finalize the impairment measurement in the third quarter.

171.     According to the press release the $21.5 million charge "represented all the goodwill associated with our NASDI and Yankee demolition subsidiaries."  The press release states that the $21.5 million charge was "due to a decline in the overall financial performance and declining cash flows in the demolition reporting unit," and that the Company "concluded there was a triggering event that required us to accelerate the test to the second quarter."  This triggering event was present throughout the Class Period and thus required Defendants to write down the value of goodwill at least by the Second Quarter of 2012.

## F. DEFENDANTS' ACCOUNTING IMPROPRIETIES WERE MATERIAL TO GLDD'S FINANCIAL STATEMENTS AS EVIDENCED BY THE RESTATEMENT ITSELF

172.     The improper revenue recognition from recording revenue from unapproved change orders had a material impact on GLDD's financial statements.  According to GAAP, a retroactive restatement of financial statements is reserved for material accounting errors "resulting from mathematical mistakes, mistakes in the application of GAAP, or oversight or misuse of facts that existed at the time the financial statements were prepared."  *Accounting Changes and Error Corrections*, ASC 250.  Since GAAP allows only for correction of errors that are "material" resulting from "mistakes in the application of GAAP . . . that existed at the time," by acknowledging their need to restate the Company's financial statements, Defendants have admitted the materiality of the errors in its previously issued financial statements.

173.    In this regard, on March 14, 2013, the Company announced in an 8-K filed with the SEC, that it "will restate its condensed, consolidated interim financial statements for the periods ended September 30, 2012 and June 30, 2012 via the filing of amended Quarterly Reports on Form 10-Q for such periods." In the 8-K, the Defendants also disclosed the following related to its demolition segment:

> During the preparation of its year-end financial statements, the Company identified instances in its demolition segment where revenue was recognized in a manner not consistent with the Company's accounting policy. The Company's policy regarding pending change orders is to immediately recognize the costs but defer the recognition of the related revenue until the recovery is probable and collectability is reasonably assured. Certain pending change orders where client acceptance has not been finalized were included as revenue. After a review, the Company concluded 2012 second and third quarter demolition segment revenues were overstated by $3.9 million and $4.3 million, respectively.

174.    The 8-K also disclosed "adjustments to dredging operating income to record $1.3 million and $0.9 million, respectively, of expenses previously capitalized and incurred in the preparation of vessels for the Wheatstone Australia LNG project."

175.    Defendants also admitted "that there was a failure of internal controls to detect or prevent misstatements in the financial statements and that such misstatements are material to the Company's results of operations for the quarterly and year-to-date periods ended June 30, 2012 and September 30, 2012, but not to any prior interim or annual period."

176.    Defendants also admitted the following regarding the Company's control deficiencies:

> Management's review and assessment of the Company's disclosure controls and procedures and management's evaluation of the Company's internal control over financial reporting, which is ongoing, has identified a material weakness. A "material weakness" is a deficiency, or a combination of significant deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

Management is in the process of completing the year-end and restated interim financial statements and assessing matters relating to the effectiveness of the Company's internal control over financial reporting. Management is also in the process of determining the steps necessary to remediate any material weakness, and recommending to the Audit Committee of the Company's Board of Directors the corrective actions that the Company could take in connection with the remediation efforts.

177.    The adjustments materially reduced the Company's previously reported quarter end results.  For example, the adjustments reduced the Company's Contract Revenues by $3.4 million, or 2.1%, for the quarter ended June 30, 2012; and by $4.3 million, or 2.6%, for the quarter ended September 30, 2012.    Additionally, the restatement adversely impacted net income, reducing net income by approximately $3.2 million or 73% for the quarter ended June 30, 2012.  The restatement also increased the Company's net loss by $3.2 million or 149% for the quarter ended September 30, 2012.

### G.    DEFENDANTS FAILED TO DISCLOSE KNOWN TRENDS OR UNCERTAINTIES IN VIOLATION OF SEC REGULATIONS

178.    Defendants also failed to disclose known trends and uncertainties in violation of SEC regulations, as a result of improperly recognizing revenue from unapproved changed orders during the 2nd and 3rd quarters of 2012.    Defendants' improprieties gave investors the impression that the GLDD's demolition segment was growing at a much faster pace and was an integral part of the Company's future prospects and growth than was actually true.

179.    Item 7 of SEC Form 10-K and Item 2 of SEC Form 10-Q, *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A") require the issuer to furnish information required by Item 303 of Regulation S-K [17 C.F.R. 229 .303]. In discussing results of operations, Item 303 of Regulation S-K requires the registrant to:

> [d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

180.    In addition, the Instructions to Paragraph 303(a) further state:

The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results . . .

181.    In its May 18, 1989 Interpretive Release No. 34-26831, the SEC indicated that registrants should employ the following two-step analysis in determining when a known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303 of Regulation S-K:

A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and is reasonably likely to have a material effect on the Registrant's results of operations.

182.    Contrary to SEC guidance, however, the Company recorded millions of dollars in revenue of unapproved change orders during the 2nd and 3rd quarters of 2012, which Defendants knew or recklessly disregarded were uncertain as to their ultimate approval by the customer and thus collectibility was not reasonably assured.

183.    Item 303 also requires that a company:

Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

184.    As described above, Defendants improperly recognized revenue from unapproved change orders.  These transactions were unusual in nature, in that they were contrary to the Company's disclosed accounting policies and GAAP.  These transactions also materially increased the Company's reported earnings by $3.4 million and $4.3 million for the quarters ended June 30, 2012 and September 30, 2012, respectively.  Moreover, these transactions gave

investors the illusion that the Company's demolition segment was growing. For example, in the Company's 2012 2nd Quarter Form 10-Q, Defendants represented the following:

> The Company's demolition subsidiaries are a major U.S. provider of commercial and industrial demolition services. Historically, the majority of the work was performed in the New England area. Through increased collaboration with Great Lakes' other lines of business, the demolition operations continue to expand into the New York area and marine demolition markets, specifically bridge demolition. In the first six months of 2012, demolition revenues accounted for 20% of total revenues, above the prior three year average of 12%.

185.    In the Company's 2012 3rd Quarter Form 10-Q, Defendants asserted that "[i]n the first nine months of 2012, demolition revenues accounted for 19% of total revenues, above the prior three year average of 12%." Defendants, however, never disclosed to investors that but for the improper recognition of unapproved change orders, year-over-year revenues would have been lower in the 2nd and 3rd quarters of 2012, as shown below:

| Demolition Segment Revenues For the Quarter Ended: | June 30 | Sept. 30 |
|---|---|---|
| As originally reported, 2012 | $31,760 | $27,952 |
| $ change | (3,425) | (4,279) |
| As restated, 2012 | 28,335 | 23,673 |
| | | |
| As reported, 2011 | 29,874 | 23,877 |
| Year over year (decrease) | (1,539) | (204) |

186.    Item 303 also states that:

> To the extent that the financial statements disclose material increases in net sales or revenues, provide a narrative discussion of the extent to which such increases are attributable to increases in prices or to increases in the volume or amount of goods or services being sold or to the introduction of new products or services.

187.    Nonetheless, GLDD's Class Period Forms 10-Q failed to disclose that the Company's revenue growth was achieved through improper recognition of unapproved change orders, its failure to properly account for cost overruns and its internal control deficiencies, each of which were all reasonably likely to have a material adverse effect on GLDD's operating

results, which was necessary for a proper understanding and evaluation of the Company's operating performance and an informed investment decision.

188.    By failing to report the facts concerning the Company's revenue recognition practices and deficient internal controls, GLDD's Class Period Forms 10-Q failed to provide investors with the most basic information necessary to understand the Company's financial results, mischaracterized the Company's revenue and operations and omitted material information.  In addition, Defendants failed to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material unfavorable impact on GLDD's operating results in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. 229.303).  These failures rendered the Company's Class Period publicly-filed financial statements on Forms 10-Q materially false and misleading.

### H.    DEFENDANTS KNEW, OR WERE RECKLESS IN NOT KNOWING, THAT GLDD'S INTERNAL ACCOUNTING CONTROLS WERE INADEQUATE

189.    Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: "(A) make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer and (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary . . . to permit the preparation of financial statements in conformity with [GAAP]." 15 U.S.C. §78m.  These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

190.    In addition to the allegations above and the indicators of scienter herein, Defendants knew or were, at the very least, deliberately reckless in not knowing that GLDD's

system of internal accounting controls governing its revenue recognition practices during the Class Period were inadequate. In fact, the Company stated that management concluded that there were significant control deficiencies that constituted material weaknesses in the Company's "processes and controls to timely and consistently capture and analyze contract change orders in our demolition segment as a result of inadequate training of segment personnel and insufficient monitoring by corporate office personnel." 2012 10-K, Item 9A (Mar. 29, 2013); 2Q 2012, 10-Q/A Item 4A (Mar. 29, 2013); 3Q 2012, 10-Q/A Item 4A (Mar. 29, 2013).

191. Moreover, in 2013, GLDD disclosed in its 2012 Form 10-K and 2nd and 3rd Quarter Forms 10-Q/A that the Company has since begun a remediation plan with no less than five actions to address the Company's material weaknesses:

    a.    A comprehensive review of the organizational resources at our demolition segment, focused on the project management and accounting functions, to determine the appropriate level of staffing and skills and to ensure those resources are put in place.

    b.    The finance team at the demolition segment will report directly to the corporate finance function, instead of divisional leadership.

    c.    Increasing the level of resources in the accounting, internal audit and compliance functions at the corporate office.

    d.    Evaluating information technology systems in our demolition segment to ensure timely and accurate information is available for period-end reporting and analysis. The Company is currently installing new estimating and project management software at its demolition segment.

    e.    Training all appropriate demolition segment and corporate accounting personnel regarding the application of the Company's accounting policy regarding revenue recognition.

192. GLDD violated §13(b)(2)(A) of the Exchange Act by failing to maintain accurate records concerning its revenues, costs, accounts receivables and net income as reported during the Class Period. The Company improperly recognized revenue from unapproved change orders, thereby overstating revenue, accounts receivable, gross profit and earnings. GLDD's inaccurate

and false records were not isolated or unique instances because they were improperly maintained for multiple reporting periods, for at least the 2nd and 3rd quarters of 2012.  Accordingly, GLDD violated §13(b)(2)(A) of the Exchange Act.

193.    In addition, the Company violated §13(b)(2)(B) of the Exchange Act by failing to implement procedures reasonably designed to prevent accounting irregularities.  GLDD failed to ensure that proper review and checks were in place to ensure that it was recording and reporting revenue and accounting for cost overruns properly.  The Company failed to ensure that transactions were reported during the Class Period in accordance with its own policies and with GAAP.  GLDD's failure to strengthen its known inadequate internal controls rendered the Company's Class Period financial reporting inherently unreliable and contributed to the Company's inability to prepare financial statements that complied with GAAP.

## VIII.   LOSS CAUSATION

194.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.  Throughout the Class Period, GLDD's stock price was artificially inflated by materially false and misleading statements and omissions that created the false impression of financial stability at the Company.  As a result, the market price of GLDD common stock was inflated by the materially false and misleading statements and omissions made by GLDD and the Individual Defendants, as identified above, and Lead Plaintiff and the Class purchased GLDD common stock at artificially inflated prices during the Class Period.

195.    The Company's ensuing disclosures on these topics, as described above, revealed to the market on a piecemeal basis the fraudulent nature of these statements and the extent of the misrepresentations contained in GLDD's financial statements that form the primary basis of this

action.  When the truth about the Company was revealed to the market, the price of GLDD's common stock declined in response, as the artificial inflation caused by Defendants' material omissions and false and misleading statements was removed from the price of GLDD's common stock, thereby causing substantial damage to Plaintiff and the other members of the Class.

196.    Indeed, during the Class Period, GLDD's common stock traded as high as $10.03 per share on February 19, 2013, and plummeted to close at $7.35 per share immediately after the Company disclosed its true financial condition, its unlawful revenue recognition practices and the need for a restatement of its past financial results and SEC filings.  The market thus immediately reacted to Defendants' disclosures and GLDD's stock price corrected itself as it was significantly driven downward.  The Company's stock price remained inflated, however, due to Defendants' continued false and misleading statements and omissions of material information.  Indeed, the Individual Defendants mitigated the impact of these disclosures and prevented the full truth about GLDD from being revealed by making contemporaneous false and misleading statements that minimized and denied the facts being revealed to the market.  As the market finally learned the magnitude of the restatement and the Company's improper revenue recognition practices following the revelations after the close of markets on August 7, 2013, GLDD's stock price plummeted again, trading as low as $6.28 per share on August 8, 2013— representing a 16% decline on unusually heavy trading volume.

197.    It was entirely foreseeable to the Individual Defendants that concealing GLDD's illicit revenue recognition practices and deficient internal controls, and, in turn, overstating the Company's revenue and financial metrics, would artificially inflate the price of GLDD common stock.  It was similarly foreseeable to the Individual Defendants that the revelation of that misconduct and the Company's true financial condition would cause the price of GLDD's

common stock to drop significantly as the inflation caused by their misstatements and omissions was corrected. Accordingly, the conduct of the Company and the Individual Defendants, as alleged herein, proximately caused foreseeable damages to Lead Plaintiff and members of the Class.

198. Thus, the stock price decline detailed herein were directly related to disclosure of the previously issued materially false and misleading statements and omissions.

## IX. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

199. At all relevant times, the market for GLDD was an open, efficient and well-developed market for the following reasons, among others:

a. GLDD's stock met the requirements for listing and was listed and actively traded on the Nasdaq under the symbol "GLDD" and the Nasdaq is a highly efficient and automated market;

b. As a public company, GLDD filed periodic public reports with the SEC;

c. The average daily trading volume for GLDD common stock during the Class Period was 357,069 shares, thus providing an average weekly trading volume that is above the 2% threshold indicative of an efficient market;

d. GLDD regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e. GLDD was followed by securities analysts employed by major brokerage firms, including D.A. Davidson, Stephens Inc., BB&T Capital Markets, Barclays PLC and CJS Securities. Each of these reports was publicly-available and entered the public marketplace;

f. Institutional investors reported owning a majority of all GLDD Common Stock during the Class Period. Indeed, as of August 9, 2013, institutional holdings of GLDD Common Stock amounted to 81% of outstanding shares according to Yahoo Finance. This high level of institutional ownership of GLDD common stock during the Class Period indicates that

the market price was reflective of active trading by extremely sophisticated and knowledgeable investors; and

g.    As a result of the foregoing, the market for GLDD common stock promptly digested current information regarding the Company from all publicly-available sources and reflected such information in GLDD's common stock price.  Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of GLDD securities at artificially inflated prices and a presumption of reliance applies.

## X.    **INAPPLICABILITY OF THE STATUTORY SAFE HARBOR**

200.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded in this Complaint.  The statements alleged to be false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

201.    To the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, GLDD and the Individual Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading.  Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false and the statement was authorized and/or approved by an executive officer of GLDD who knew that such statement was false when made.

## XI.    CLASS ACTION ALLEGATIONS

202.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired GLDD's common stock during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each Individual Defendant; (iii) any person who was an officer or director of GLDD during the Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any Defendant has or had a controlling interest; (v) any person who participated in the wrongdoing alleged herein; and (vi) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any such excluded party.

203.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, GLDD's common stock was actively traded on the Nasdaq, an efficient market.  As of May 3, 2013, the Company had more than 59 million shares of common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds of thousands of members in the Class.

204.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class predominate over questions that may affect individual Class members, including:

h.    Whether Defendants violated the federal securities laws;

i.    Whether Defendants misrepresented material facts concerning GLDD;

j. Whether Defendants' statements omitted material facts necessary to make the statements not misleading in light of the circumstances under which they were made;

k. Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

l. Whether Defendants engaged in perpetrating a manipulative and deceptive device and/or scheme and/or otherwise engaged in a fraudulent course of conduct;

m. Whether the GLDD SEC filings issued during the Class Period which contained financial information (*i.e.*, its Forms 10-K, 10-Q, 8-K, and S-3) contained untrue or materially misleading statements;

n. Whether the prices of the Company's common stock were artificially inflated; and

o. The extent of damages sustained by Class members and the appropriate measure of damages.

205. The claims of Lead Plaintiff are typical of those of the Class.

206. Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

207. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**XII.** **JURISDICTION AND VENUE**

208. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), 78t-1) and the rules and regulations promulgated thereunder, including Rule 10b-5 (17 C.F.R. §240.10b-5).

209. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1307, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

210.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act.  GLDD maintains its corporate headquarters in this District, and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

211.    In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## XIII.    CLAIMS AGAINST DEFENDANTS UNDER THE EXCHANGE ACT

### FIRST CLAIM FOR RELIEF
**For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5
(Against Defendants GLDD and the Individual Defendants)**

212.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

213.    During the Class Period, Defendants GLDD and the Individual Defendants disseminated or approved the false statements specified herein, which they knew or recklessly disregarded were misleading in that they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and they contained material misrepresentations.

214.    These Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of GLDD

94

common stock during the Class Period. As detailed herein, the misrepresentations contained in, or the material facts omitted from, these Defendants' public statements, concerned, among other things, the Company's improper accounting and deficient internal controls.

215. These Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with a reckless disregard for the truth; and employed devices, and artifices to defraud in connection with the purchase and sale of securities, which were intended to, and did: (i) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, GLDD's financial and operational results, including but not limited to, the Company's accounting manipulations, improper revenue recognition and deficient internal controls; (ii) artificially inflate and maintain the market price of GLDD stock; and (iii) cause members of the Class to purchase the Company's securities at artificially inflated prices.

216. Defendant GLDD is liable for all materially false and misleading statements made during the Class Period, as alleged above.

217. GLDD is further liable for the false and misleading statements made by the Company's officers in press releases and during conference calls and at conferences with investors and analysts, as alleged above, as the makers of such statements and under the principle of *respondeat superior*.

218.     The Individual Defendants, as top executive officers of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers of the Company, each of these Defendants was able to and did control the content of the public statements disseminated by GLDD.  These Defendants had direct involvement in the daily business of the Company and participated in the preparation and dissemination of the false and misleading statements, as set forth above.

219.     In addition, the Individual Defendants are liable for, among other material omissions and false and misleading statements, the false and misleading statements they made and/or signed as follows:

a.       Defendant Berger signed GLDD's false and misleading Form 10-K filed with the SEC on March 29, 2013.  Defendant Berger also signed the certifications filed as exhibits to the Company's Forms 10-Q filed with the SEC on August 7, 2012, November 7, 2012 and May 8, 2013, and the Company's Form 10-K filed with the SEC March 29, 2013.  Berger falsely certified that the Company's Class Period false and misleading filings fairly presented GLDD financial conditions and results of operations, and he falsely certified that the Company's internal controls were effective and compliant with Rule 13a-15(f) or 15d-15(f) promulgated under the Exchange Act.  Berger also made statements in and was directly responsible for other false and misleading statements disseminated in GLDD press releases filed with the SEC on Forms 8-K on August 7, 2012, November 6, 2012, March 14, 2013 and May 7, 2013.  Berger also made false and misleading statements during the earnings calls on August 7, 2012, March 15, 2013 and May 7, 2013, and the investor presentation conference on September 20, 2012.

b.       Defendant Biemeck signed GLDD's false and misleading Form 10-Q filed with the SEC on August 7, 2012.  In addition, Biemeck falsely certified that the false and misleading filing fairly presented GLDD's financial condition and its results of operations, and he falsely certified that the Company's internal controls were effective and compliant with Rule 13a-15(f) or 15d-15(f) promulgated under the Exchange Act.  Biemeck made false and misleading statements in and was directly responsible for other statements made in GLDD's press releases filed with the SEC on Forms 8-K on August 7, 2012 and November 6, 2012.  Biemeck also made false and misleading statements during an earnings call on November 6, 2012.

  c.  Defendant Steckel signed GLDD's false and misleading Forms 10-Q filed with the SEC on November 7, 2012 and May 8, 2013 and the false and misleading Form 10-K filed with the SEC on March 29, 2013. In addition, Steckel falsely certified that the Company's false and misleading filings fairly presented GLDD's financial condition and results of operations, and he falsely certified that the Company's internal controls were effective and compliant with Rule 13a-15(f) or 15d-15(f) promulgated under the Exchange Act. Steckel made false and misleading statements in and was directly responsible for other false and misleading statements made in GLDD's press releases filed with the SEC on Forms 8-K on November 6, 2012, March 14, 2013 and May 7, 2013. Steckel also made false and misleading statements during the investor presentation conference on October 11, 2012 and the earnings calls on March 15, 2013 and May 7, 2013.

220. As described above, these Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

221. Lead Plaintiff and the Class have suffered damages in that they paid artificially inflated prices for GLDD common stock. Lead Plaintiff and the Class would not have purchased GLDD common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

222. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their purchases of GLDD stock during the Class Period.

## SECOND CLAIM FOR RELIEF
### For Violations Of Section 20(a) Of The Exchange Act
### (Against Defendants the Individual Defendants)

223. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

224.     This Count is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

225.     As alleged in detail above, GLDD committed a primary violation of the federal securities laws through its knowing and/or reckless dissemination of materially false and misleading statements and omissions throughout the Class Period.

226.     During their tenures as officers and/or directors of GLDD, each of these Defendants was a controlling person of GLDD within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of the Company, these Defendants had the power and authority to cause GLDD to engage in the wrongful conduct complained of herein.  As set forth in detail above, the Defendants named in this Count were able to and did control, directly and indirectly, and exert control over GLDD, including the content of the public statements made by the Company during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

227.     In their capacities as senior corporate officers of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of GLDD and in the Company's financial reporting and accounting functions.  Each of these Defendants was also directly involved in providing false information and certifying and/or approving the false financial statements disseminated by GLDD during the Class Period. Further, as detailed above, the Individual Defendants had direct involvement in the presentation and/or manipulation of false financial reports included within the Company's press releases and filings with the SEC.

228. The Individual Defendants all received various written and oral reports from different divisions of the Company on a routine basis. The Individual Defendants' knowledge of and participation in the Company's affairs through the various reports they received and/or had access to are described above in Sections IV(B)-(C).

229. By reason of their positions as officers of GLDD, and more specifically as controlling officers—as can be seen by their corresponding ability to influence and control the Company—each of these Defendants is a "controlling person" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to direct the management and activities of the Company and its employees, and to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions, these Defendants had access to adverse nonpublic financial information about GLDD and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same. Moreover, each of the Defendants was also involved in providing false information and certifying and/or approving the false financial statements disseminated by the Company during the Class Period. Each of these Defendants was provided with or had access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

230. As set forth above, GLDD violated Section 10(b) of the Exchange Act by its acts and omissions alleged in this Complaint. By virtue of their positions as controlling persons of the Company and as a result of their own aforementioned conduct, the Defendants named in this Count are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-

5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased

or otherwise acquired GLDD securities.

231.    As a direct and proximate result of these Defendants' conduct, Lead Plaintiff and

the Class suffered damages in connection with their purchase or acquisition of GLDD stock.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment individually and on behalf of the Class,

as follows:

a.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal
Rules of Civil Procedure;

b.    Awarding Lead Plaintiff and the Class members damages, including interest;

c.    Awarding Lead Plaintiff reasonable costs, including attorneys' and experts' fees;
and

d.    Awarding such equitable/injunctive or other relief for the benefit of the Class as
the court may deem just and proper.

## XV.  JURY DEMAND

Lead Plaintiff demands a trial by jury for all issues so triable.

Dated: August 9, 2013                Respectfully submitted,

**LASKY & RIFKIND, LTD.**

By: */s/ Norman Rifkind*
Norman Rifkind
Amelia S. Newton
351 West Hubbard Street, Suite 401
Chicago, IL 60654
Tel: (312) 634-0057
Fax: (312) 634-0059

*Liaison Counsel for the Class*

**SAXENA WHITE P.A.**

Maya Saxena
Joseph E. White, III

100

Lester R. Hooker
Brandon T. Grzandziel
2424 North Federal Highway, Suite 257
Boca Raton, FL 33431
Tel:  (561) 394-3399
Fax:  (561) 394-3382

*Counsel for Plaintiff and Lead Counsel for the
Class*

## <u>CERTIFICATE OF SERVICE</u>

Norman Rifkind, an attorney, hereby certifies that on August 9, 2013, he caused the

foregoing document to be electronically filed using the CM/ECF system, which will send notice

of this filing to all registered users.


      <u>  /s/ Norman Rifkind      </u>