IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED UNION ROOFERS, WATERPROOFERS & ALLIED WORKERS LOCAL UNION NO. 8, <br><br> Plaintiff, <br><br> v. <br><br> GREAT LAKES DREDGE & DOCK CORPORATION, et al., <br><br> Defendants. | Civil Action No. 13 CV 2115 <br><br> Hon. Charles R. Norgle |

### ORDER

Defendants' Motion to Dismiss Amended Complaint [36] is denied. The parties shall submit an agreed written discovery plan within twenty-one days.

### STATEMENT

In this securities fraud class action case, Lead Plaintiff United Union of Roofers, Waterproofers & Allied Workers Local Union No. 8 ("Lead Plaintiff"), on behalf of all persons or entities that purchased Great Lakes Dredge & Dock Corporation ("GLDD") securities between August 7, 2012 and August 7, 2013 (the "class period"), sues Defendants GLDD, Jonathan W. Berger ("Berger"), Bruce Biemeck ("Biemeck"), and William S. Steckel ("Steckel") (collectively, "Defendants") for violations of § 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j, and Rule 10b-5, 17 C.F.R. § 240.10b-5, as well as § 20(a) of the 1934 Act. Before the Court is Defendants' motion to dismiss Lead Plaintiff's Amended Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). On September 24, 2014, the Court held an extensive hearing on the matter, and orally denied the motion. However, the Court improvidently emphasized that there was enough pleaded to deny the motion to dismiss under Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007), and its progeny; and, stated without discussion that the complaint also satisfies the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 109 Stat. 737. On October 1, 2014, the Court granted Defendants' motion to reconsider, and now articulates more comprehensively its decision under the PSLRA. For the following reasons, Defendants' motion to dismiss is denied.

In its 100-page complaint, Lead Plaintiff alleges, inter alia, that Defendants made false statements regarding: (1) GLDD's financial condition and operational results as represented in its press releases, quarterly Securities Exchange Commission (SEC) filings throughout the class period, and its certifications and disclosures; (2) GLDD's compliance with Generally Accepted Accounting Principles ("GAAP"); (3) GLDD's internal financial controls as defined in Rule 13a-15(f) and 15d-15(f) under the 1934 Act, and (4) the value of GLDD's goodwill. According to

Lead Plaintiff, these misstatements caused artificial inflation in GLDD's common stock price during the class period; and, on March 15, 2013, the day after GLDD announced its financial restatement, the stock price declined by eighteen percent.

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1317 (2011) (internal quotation marks and citation omitted). Because this action is governed by the heightened pleading requirements of the PSLRA, Lead Plaintiff must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.,* the defendant's intention to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) [hereinafter Tellabs II] (internal quotation marks and citation omitted).

In deciding at Rule 12(b)(6) motion to dismiss a § 10(b) action, the Court must follow three well-established prescriptions: (1) "accept all factual allegations in the complaint as true"; (2) "determine whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter"; and (3) "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id. at 322-24 (citations omitted). The Court must "dismiss the complaint unless 'a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 705 (7th Cir. 2008) [hereinafter Tellabs III] (quoting Tellabs II, 551 U.S. at 324). Put differently, "[t]he plaintiff 'must plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference.'" Id. (quoting Tellabs II, 551 U.S. at 324).

Defendants argue only that the complaint should be dismissed for failure to sufficiently plead scienter. Scienter means "knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." Pugh v. Tribune Co., 521 F.3d 686, 693 (7th Cir. 2008) (internal quotation marks and citation omitted). During oral argument, counsel for Defendants conceded that the complaint alleges that Defendants filed fraudulent statements with the SEC and to the public generally, and admitted that GLDD "did restate financials because they were inaccurate." Tr. of Proceedings at 33 (N.D. Ill. Sept. 24, 2014). Defendants argue that the inaccuracies were the result of reasonable judgments that revenue from its demolition projects in the New York area—which were performed by NASDI, LLC ("NASDI") (an entity owned by GLDD)—would be recognized but, at year-end, it was determined that some of the revenue should not have been recognized. Defendants contend that the problem was corrected at the very first opportunity. Lead Plaintiff, however, alleges that the financial problems in the demolition segment were severe from the outset of the New York projects, and that during the class period Defendants concealed the underperformance of these projects by booking proposed contract increases listed on change orders as revenue when those change orders remained pending without client approval. In addition, Lead Plaintiff alleges that Defendants publicly touted that the demolition revenue, as a percentage of total revenues, was increasing on an annual basis until March 14, 2013, when it revealed its financial restatement.

Lead Plaintiff alleges that the following supports a strong inference of scienter: (1) GLDD prematurely recognized revenue and associated fictitious revenue with at least two demolition projects in the New York area, (2) GLDD postponed filing its 2012 annual report

2

with the SEC, (3) GLDD had material weaknesses in its internal controls over financial reporting during the class period, (4) GLDD's president and chief operating officer, Defendant Biemeck, who was also the chief financial officer, resigned on the same day as GLDD's financial restatement, (5) the importance of the demolition segment to GLDD, and (6) the first-hand accounts of confidential witnesses ("CWs") detailing GLDD's problems with its New York demolition projects.

      Defendants argue that the Court should disregard all allegations derived from the CWs. However, "the absence of proper names does not invalidate the drawing of a strong inference [of scienter] from informants' assertions," where, as here, the confidential sources listed in the complaint "consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify." Tellab III, 513 F.3d at 712 (citations omitted). Here, two of the five confidential witnesses formerly held the position of Vice President of Operations for GLDD's NASDI division, and were responsible for overseeing the demolition projects in New York, including regularly reporting the operational and financial statuses of projects to NASDI and GLDD executives—CW1 was employed with the demolition division from 2003 until mid-2011; CW3, took over the position following CW1 until her departure in March 2012, several months before class period began in August 2012. Although both individuals had left NASDI prior to the alleged fraud, the Court finds that their knowledge is nevertheless relevant in determining whether the facts alleged in the complaint support a strong inference of scienter. See In re Merck & Co. Sec. Litig., 432 F.3d 261, 272 (3d Cir. 2005) ("[B]oth post-class-period data and pre-class data could be used to 'confirm what a defendant should have known during the class period,' noting that '[a]ny information that sheds light on whether class period statements were false or materially misleading is relevant.'" (quoting In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72 (2d Cir. 2001)) (second alteration in original)).

      Specifically, NASDI's former Vice President of Operations, CW1, reported that she had discussed the status of the New York projects with GLDD Senior Vice President of Business Development Stephen Pegg (who reported directly to Defendants Biemeck and Berger), and that it was clear during these meetings that certain of the New York projects were over-budget, including the St. George Ferry project and the Whitestone project. CW1's successor, CW3, asserted that her NASDI and GLDD superiors acknowledged the cost overruns from the outset of her involvement in the projects. CW3 stated that the overruns occurred because the company had underbid the projects. In addition, CW3 described the financial difficulties in the New York projects. For example, with respect to the Whitestone project, which NASDI bid at approximately $4,850,000, CW3 stated that when the project was sixty to sixty-five percent completed, it had incurred losses of $7,700,000. She further asserted that the flawed New York operations resulted in "*tons of change orders*." Am. Class Action Compl. ¶ 41 (emphasis in original). CW3 stated that in many instances, the change orders for reimbursement of additional costs would be prepared but the client was under no obligation to honor the claims; thus, GLDD would either not get paid, or would be forced to initiate legal proceedings in an attempt to collect these costs.

      Additionally, a former Project Manager/Estimator, CW4, employed at NASDI between July 2010 and October 2012, corroborates many of CW3's accounts regarding the New York projects. CW4 stated that while she was not directly assigned to the Whitestone and St. George Ferry projects, she remembered that the projects were "extremely troubled and resulted in massive cost overruns for the Company." Id. ¶ 44. CW4 stated that the Whitestone project had

lost upwards of $7 million and that the St. George Ferry project had lost between $4 and $5 million. She "understood that the Company had *deliberately underbid* on the projects so that NASDI could become established in the New York market and fulfill GLDD's corporate objective" for expansion. Id. (emphasis in original). While these assertions are entitled to less weight because she was not personally involved with these projects, CW4 nevertheless provided first-hand accounts to support Lead Plaintiffs allegations that costs were shifted amongst the New York projects—she recounted her participation in monthly "billing meetings" attended by GLDD officials, wherein accounting manipulations were discussed. Id. ¶ 49. CW4 also stated that Defendants Steckel and Biemeck received frequent financial reports from the NASDI Controller that would have incorporated the accounting manipulations.

Moreover, GLDD's former Staff Accountant, CW5, who was employed there from January of 2012 until May of 2013, substantiates that the alleged financial cover-up at NASDI was known at the parent company, GLDD. CW5 stated that Defendant Biemeck was involved in nearly all of GLDD's financial matters. She further asserted that there were variances between the amounts that NASDI had billed its customers—which were improperly booked as revenue—and the amounts GLDD actually received as payments for those bills. CW5 also stated that "it was 'well known' within GLDD that NASDI was 'not very profitable' and that GLDD was transferring monetary amounts between divisions and directly paying NASDI expenses, including bills and in some instances employee salaries, in order to bolster the demolition segment's profitability and financial results." Id. ¶ 55. Accepting all of Lead Plaintiff's allegations as true, including the confidential witnesses' statements, these factual allegations, viewed holistically, support a cogent inference of scienter. Indeed, what reasonable inferences to draw from the silence and the timing of Defendant Biemeck's unembellished resignation, after discovery on the issue, will be for a jury to determine at trial.

To counter this inference, Defendants offer several non-culpable explanations for their conduct. First, Defendants argue that there is no allegation that they had a motive to commit fraud. However, this argument is unavailing because "the absence of a motive allegation is not fatal." Tellabs II, 551 U.S. at 325. Next, Defendants argue that the most plausible inference is that they thought the revenue recognition was appropriately accounted, and that the high-level executives would not know or have reason to suspect any technical mistakes or misjudgments in NASDI's accounting during the class period. The Court nevertheless finds that the inference of scienter favoring Lead Plaintiff—Defendants knew or recklessly publicized false statements—is at least as likely as Defendants' opposing inference. Simply put, there is enough pleaded to deny the motion to dismiss under the PSLRA.

Finally, because Lead Plaintiff adequately alleges that Defendants Berger, Biemeck, and Steckel were "controlling persons" in the underlying violations of § 10(b) and Rule 10b-5, Defendants' motion to dismiss the § 20(a) claim is denied. Pugh, 521 F.3d at 693.

For the foregoing reasons, Defendants' motion to dismiss is denied. IT IS SO ORDERED.

ENTER: *[signature]*
CHARLES RONALD NORGLE, Judge
United States District Court

DATE: October 21, 2014

4